In re AIRPORT CAR RENTAL ANTITRUST LITIGATION.

MDL No. 338.

United States District Court, N. D. California.

June 25, 1979.

Robert R. Salman, Martin Stein, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, Richard J. Lucas, Norman C. Hile, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., James B. Lockhart, Vice President & General Counsel, Budget Rent A Car Corp., Chicago, Ill., for Budget Rent A Car Corp. & Budget Rent A Car Systems.

James S. Ramsey, Jr., Timothy A. Duffy, Crutcher, Hull, Ramsey & Jordan, Dallas, Tex., for Hayes Leasing Co., Inc.

John N. Hauser, James L. Hunt, Gary H. Moore, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Maxwell M. Blecher, Daphne M. Stegman, Blecher, Collins & Hoecker, Los Angeles, Cal., David I. Schaffer, Senior Vice-President, etc., Avis Rent A Car System, Inc., New York City, David J. Reber, Goodsell, Anderson & Quinn, Honolulu, Hawaii, for Avis Rent A Car System.

Daniel R. Shulman, Michael P. Sullivan, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., James J. Walsh, Pillsbury, Madison & Sutro, San Francisco, Cal., George D. Reycraft, Cadwalader, Wickersham & Taft, New York City, Vernon F. L. Char, Damon, Key, Char & Bocken, Honolulu, Hawaii, for National Car Rental System.

James J. Kenny, Kenny, Nachwalter & Seymour, Miami, Fla., for Budget-Florida.

Joseph M. Alioto, Steven J. Cannata, Alioto & Alioto, San Francisco, Cal., Theodore F. Schwartz, Clayton, Mo., for Dollar Rent A Car.

James V. Hammett, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Austin, Tex., for Texas Auto Services.

John R. Dwyer, Jr., Ronald S. Adelman, Carlsmith & Dwyer, Honolulu, Hawaii, for Pacific Auto Rental Corp.

Robert D. Raven, Morrison & Foerster, San Francisco, Cal., Jerome J. Shestack, Arthur H. Kahn, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., William M. Swope, Cades Schutte Fleming & Wright, Honolulu, Hawaii, for the Hertz Corp.

James F. Ventura, Libkuman, Ventura, Moon & Ayabe, Honolulu, Hawaii, for Budget Rent-A-Car Systems.

Robert Kimura, Honolulu, Hawaii, for Taylor Transportation-National Car Rental.

Jacob K. Stein, Paxton & Seasongood, Cincinnati, Ohio, for Byrnic, Inc.

Michael D. Donahue, Jonas, Fern & Simpson, Los Angeles, Cal., F. Douglas Ruud, Lycette, Diamond & Sylvester, Seattle, Wash., for Budget of Washington-Oregon.

John F. Triggs, Greenberg, Irsin, Pellman & Slade, New York City, for DRC Industries, Inc.

Francis O. Scarpulla, James M. Garlock, David A. Sherman, Scarpulla & Garlock, San Francisco, Cal., for Trans Rent-A-Car.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

This consolidated multidistrict litigation involves eight actions brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, by Dollar Rent-A-Car System ("Dollar") and various licensees of Dollar and Budget Rent-A-Car Corporation ("Budget").[1] Defendants include The Hertz Corporation ("Hertz"), Avis Rent-A-Car System ("Avis"), and National Rent-A-Car System, Inc. ("National"). Plaintiffs allege

---

1. The eight actions, and the districts in which they originated, are as follows:

 *Budget Rent-A-Car Co. of Florida, Inc., et al. v. The Hertz Corp., et al.* (S.D.Fla.);
 *Budget Rent-A-Car of Washington-Oregon, Inc., et al. v. The Hertz Corp., et al.* (C.D. Cal.);
 *Brynic, Inc., et al. v. The Hertz Corp., et al.* (S.D.Ohio);
 *Dollar Rent-A-Car Systems, Inc. v. The Hertz Corp., et al.* (N.D.Cal.);
 *DRC Industries, Inc., et al. v. The Hertz Corp., et al.* (S.D.N.Y.);

 *Pacific Auto Rental Corp., etc. v. The Hertz Corp., et al.* (D.Hawaii);
 *Texas Auto Services, Inc. v. The Hertz Corp., et al.* (N.D.Cal.);
 *Trans Rent-A-Car, Inc. v. The Hertz Corp., et al.* (N.D.Cal.).
 See *In Re Airport Car Rental Antitrust Litigation*, (J.P.M.L.1979), 459 F.Supp. 1006 (Jud. Pan.Mult.Lit.1978), 448 F.Supp. 273 (Jud.Pan. Mult.Lit.1975). A ninth action, *Budget Rent-A-Car Corp., et al. v. The Hertz Corp., et al.* (N.D.Cal.), was settled and dismissed on February 8, 1979.

a conspiracy to restrain trade in and to monopolize the on-airport car rental market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[2]

There are three motions presently before the Court.[3] The first, brought jointly by defendants Hertz, Avis, National, and an Avis licensee, seeks summary judgment in the actions affecting airports in Austin, Texas; Denver, Colorado; and Miami, Florida. This motion is based on two separate contentions: First, that the *Noerr-Pennington* doctrine immunizes defendants' conduct from the reach of the antitrust laws; and second, that that there is no causal connection linking defendants' actions with plaintiffs' alleged injury.

The second motion is directed primarily against plaintiff Dollar. *See infra,* at 1103 n.32. Defendants contend that Dollar has no standing under Section 4 of the Clayton Act to sue for damages with respect to airports from which its licensees were excluded. Defendants argue that the damage suffered by plaintiff as a result of the exclusion of its licensees is too remote or incidental to serve as a basis for standing.

Defendants' third motion is for a pre-trial order governing burden of proof. Focusing on plaintiff Dollar's intention to prove "fact of damages" by reference to a representative sampling of airports, defendants seek a pre-trial order pursuant to Rule 16 establishing that Dollar will not be entitled to damages with respect to airports for which no separate evidence has been presented.

The Court will address each of these motions in turn.

## I. *NOERR–PENNINGTON*

In April 1977, before these actions were consolidated, defendants Hertz and Avis moved for partial judgment on the plead-

ings in No. C–75–2650–CBR, arguing that the *Noerr-Pennington* doctrine exempted their activities from the reach of the antitrust laws. After considering the parties' arguments and undertaking a preliminary inquiry into the scope of the doctrine, this Court denied defendants' motion. Because there was "so much variation among the 140 airports involved in [the] action," and because "defendants themselves admit[ted] that '[t]he availability to defendants of * * * *Noerr* defenses [would] require proof at trial on an airport-by-airport basis,'" the Court concluded that defendants "failed to sustain their burden of showing that plaintiff can prove no set of facts that would remove its action from the *Noerr-Pennington* exception." *Dollar Rent A Car Systems, Inc. v. Hertz Corp.,* 434 F.Supp. 513, 517 (N.D.Cal.1977).

Shortly after consolidation of the first seven actions, the Court entered a pre-trial order permitting defendants jointly to file a renewed motion for summary judgment predicated on *Noerr-Pennington* and authorizing full factual discovery directed at the airports chosen by defendants to be the focus of that motion. Defendants chose the airports in Austin, Texas; Denver, Colorado; and Miami, Florida, and undertook extensive discovery to support their claim. They then brought this motion, supplemented by a lengthy statement of facts and numerous exhibits. After having considered defendants' papers, plaintiffs' memoranda of facts and law in opposition, and the arguments of counsel, the Court concludes that defendants' motion must be denied as to its *Noerr-Pennington* defense.

### A. *Background of the Noerr-Pennington —Doctrine*

In *Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S.

2. Plaintiffs have alleged that defendants submitted bidding specifications and contractual provisions for on-airport car rental concessions that were designed to exclude all competing car rental companies, agreed to oppose applications for on-airport concessions submitted by their competitors and did so in bad faith and through the use of misrepresentations, used bribery to gain the favor of airport officials and to induce them to exclude defendants' competi-

tors from the on-airport market, and agreed to fix and to stabilize prices for on-airport car rentals throughout the United States.

3. A fourth motion, seeking to strike Budget and Budget licensees' allegations of fraudulent concealment, was withdrawn without prejudice by defendants on February 29, 1979, pursuant to Local Rule 220–10.

127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), a group of trucking companies and their trade association sued 24 railroads, a railroad association, and a public relations firm under Sections 1 and 2 of the Sherman Act. They alleged that defendants had entered into a joint conspiracy to influence legislative and executive action for the purpose of destroying competition in the long-haul freight business. The Supreme Court found the railroads' actions to be wholly immune from the antitrust laws, holding that a violation of the Sherman Act could not be predicated on mere attempts to influence the passage or enforcement of laws even if the purpose and effect of such influence was anti-competitive. 365 U.S. at 135–136, 81 S.Ct. 523. This conclusion rested on the necessity of preserving the informed operation of governmental processes and of protecting the right of petition guaranteed by the First Amendment. 365 U.S. at 137–138, 81 S.Ct. 523, *see Franchise Realty v. S. F. Joint Exec. Bd.,* 542 F.2d 1076, 1080 (9 Cir. 1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). In addition, the Court found that Congress had not intended to regulate "political activity," pointing to the "essential dissimilarity between an agreement jointly to seek legislation or law enforcement and the agreements traditionally condemned by § 1 of the Act." 365 U.S. at 136–137, 81 S.Ct. at 529, *see Kurek v. Pleasure Driveway & Park Dist.,* 557 F.2d 580, 592 (7 Cir. 1977), *vacated and remanded,* 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81, *on remand,* 583 F.2d 378 (7 Cir. 1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979).

The Supreme Court reaffirmed and extended *Noerr* four years later in *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Pennington,* a small coal mining company filed a cross claim under Sections 1 and 2 of the Sherman Act against the United Mine Workers, its trustees, and certain large coal operators, alleging a joint conspiracy to influence the Secretary of Labor and other government officials [4] to establish a high minimum wage for employees of contractors selling coal to the TVA. The intended victims of this conspiracy were the smaller coal companies operating in the TVA term contract market. 381 U.S. at 660, 85 S.Ct. 1585. Despite defendants' anticompetitive intentions, the Court determined that their conduct was protected from the reach of the antitrust laws. "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition," and even though the challenged conduct may be "part of a broader scheme itself violative of the Sherman Act." *Id.* at 670, 85 S.Ct. at 1593.

The most recent pronouncement of the Supreme Court in this area came in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In *California Motor* the Court again affirmed the validity of the *Noerr-Pennington* doctrine and concluded that its protection should extend to joint activity to influence courts and administrative adjudicative bodies.[5]

Defendants rely heavily on *California Motor* in arguing that they are entitled to antitrust immunity because the airport officials they allegedly sought to influence were representatives of local administrative bodies. In response, plaintiffs make three arguments: First, that *Noerr-Pennington* does not immunize private parties who seek

---

**4.** In addition to seeking to influence the Secretary of Labor, defendants sought to have the TVA restrict its spot market purchases of coal. These spot market purchases were exempt from the wage prescriptions of the Secretary. Thus, by influencing the TVA to restrict these purchases, defendants were attempting to support the higher minimum wage policy established by the Secretary.

**5.** Plaintiffs in *California Motor* alleged a concerted effort by defendants to institute state and federal proceedings designed to interfere with and to defeat plaintiffs' applications for operating rights. Although the Court agreed that *Noerr-Pennington* protection extended into the administrative and judicial arenas, it found that plaintiffs had alleged conduct that would come within the "sham" exception to *Noerr,* and which would therefore not be immunized.

to influence officials acting in a commercial rather than in a governmental capacity; second, that defendants' actions fall within the "sham" exception to *Noerr-Pennington* ; and third, that *Noerr-Pennington* does not immunize private parties who, rather than seeking merely to *influence* government officials, were actually acting *in concert* with them. Because the Court agrees with plaintiffs that defendants were seeking to influence government officials acting in a commercial or proprietary capacity, and that the *Noerr-Pennington* doctrine does not immunize such efforts from the reach of the antitrust laws, there is no need to address plaintiffs' second and third contentions.

### B. The "Commercial Activity" Exception to Noerr-Pennington

#### 1. Case Analysis

The Supreme Court has never created an explicit "commercial activity" exception to the *Noerr-Pennington* doctrine. None of the cases before it have turned on whether the government officials plaintiffs were seeking to influence were performing a commercial or proprietary rather than a governmental or policy-making function.[6] A number of lower courts have considered this issue, however, and it is upon these

cases as well as upon the Supreme Court's latest pronouncements with respect to *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943),[7] that plaintiffs rely.

The primary case plaintiffs rely upon is *George R. Whitten, Jr. Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25 (1 Cir.), cert. denied, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970), *on remand,* 376 F.Supp. 125 (D.Mass.), *aff'd,* 508 F.2d 547 (1 Cir. 1974), cert. denied, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). In *Whitten,* a manufacturer and designer of swimming pool gutters and accessories, which was also a general contractor for the construction of swimming pool facilities, brought suit against a competitor and its dealers under Sections 1 and 2 of the Sherman Act. Plaintiff charged that defendants had conspired to influence public officials to adopt bidding specifications for construction of public swimming pools that were drafted to apply only to defendants' pools. Conceding the truth of this allegation for the purposes of the summary judgment motion, defendants nonetheless contended that their activities were protected under both *Parker v. Brown* and *Noerr-Pennington.*

The Court rejected both arguments. Regarding *Parker,* the Court agreed with defendants' general proposition that restraints of trade resulting from valid gov-

---

**6.** But cf. *Continental Ore Co. v. Union Carbide & Carbon Co.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). In *Continental Ore,* plaintiffs alleged that defendants had conspired to restrain trade and commerce in vanadium ore. As part of this conspiracy defendants allegedly directed their Canadian subsidiary, which had been "appointed by the Canadian Government as its exclusive wartime agent to purchase and allocate vanadium for Canadian industry," to eliminate plaintiff from the Canadian market. 370 U.S. at 695, 82 S.Ct. at 1408. Although defendant argued that its actions were immune under *Noerr* because they involved an attempt to influence a governmental decision, the Court disagreed, stating:

"[Defendants] were engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws. To subject them to liability under the Sherman Act for eliminating a competitor from the Canadian market by exercise of the discretionary power conferred upon [the subsidiary] by the Canadian Government would effectuate the purposes

of the Sherman Act and would not remotely infringe upon any of the constitutionally protected freedoms spoken of in *Noerr. Id.* at 707–708, 82 S.Ct. at 1415.

**7.** The Supreme Court in *Parker* relied on principles of federalism and state sovereignty in holding that the antitrust laws were not intended to be applied to states acting in a sovereign capacity. 317 U.S. at 350–351, 63 S.Ct. 307. Although the case is often described for the sake of simplicity as having created an antitrust "immunity" or an "exemption" from the antitrust laws, it more accurately should be considered a limitation on the scope or reach of the antitrust laws. See *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 393 n. 8, 98 ·S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Kurek v. Pleasure Driveway & Park Dist., supra,* 557 F.2d at 587 n. 5; *Duke & Co. v. Foerster,* 521 F.2d 1277, 1279 n. 5 (3 Cir. 1975); Handler, Antitrust—1978, 78 Colum.L.Rev. 1363, 1378 (1978).

ernmental action cannot give rise to private antitrust liability. 424 F.2d at 29. However, it concluded that "the adoption of [defendants' specifications by public bodies does not bring [defendants] within the exemption for valid governmental action." *Id.* at 31.[8] Turning its attention to *Noerr-Pennington* and defendants' contention that its challenged activity was a legally protected effort to influence public officials in the passage or enforcement of laws, the Court developed the commercial/governmental distinction that is at the heart of the summary judgment motion now before this Court.

The "key" to the *Noerr* decision, according to the First Circuit, was the Supreme Court's

"heavy emphasis on the political nature of the railroad's activities and its repeated reference to the 'passage or enforcement of laws.' The entire thrust of *Noerr* is aimed at insuring uninhibited access to government *policy makers.* * * * By 'enforcement of laws' we understand some *significant policy determination* in the application of a statute, not a technical decision about the best kind of weld to use in a swimming pool gutter." *Id.* at 32 (emphasis added).

The Court further asserted that *Pennington's* broad language to the effect that "[j]oint efforts to influence public officials

do not violate the antitrust laws * * *," 381 U.S. at 670, 85 S.Ct. at 1593, did not undercut this interpretation:

"*Noerr* stressed the importance of free access to public officials vested with significant policy-making discretion. We doubt whether the Court [in *Pennington*], without expressing additional rationale, would have extended the *Noerr* umbrella to public officials engaged in purely commercial dealings when the case turned on other issues." *Id.* at 33.[9]

Because of its conclusion that the *Noerr-Pennington* defense applied only to efforts to influence government officials acting in a non-commercial, policy-making capacity, the Court rejected defendants' reliance on the doctrine, holding that *Noerr-Pennington* "does not extend to efforts to sell products to public officials acting under competitive bidding statutes." *Ibid.* Moreover, after reaching this conclusion, the Court buttressed its case analysis with supporting First Amendment analysis:

"This conclusion does not, in our view, encroach on the freedom of speech and right to petition protected by the First Amendment. The First Amendment does not provide the same degree of protection to purely commercial activity that it does to attempts at political persuasion. *Cf. Valentine v. Chrestensen,* 316 U.S. 52, 62

8. In analyzing defendants' "state action" claim, the First Circuit correctly noted that "the assertion that an act is 'valid governmental action * * * suggests inquiry rather than ends it.'" 424 F.2d at 30 (citation omitted). It was convinced that "valid government action confers antitrust immunity only when government determines that competition is not the *summum bonum* in a particular field and deliberately attempts to provide an alternative form of public regulation." *Ibid.* Because there was no "anti-competitive" policy compelling the public bodies' decision-making in *Whitten,* the court refused to confer *Parker* immunity on defendants. *Id.* at 31. *See City of Lafayette, supra,* 435 U.S. at 413, 98 S.Ct. 1123.

9. Defendants have argued in the litigation before this Court that *Noerr-Pennington* could not be limited to attempts to influence the Government acting in a non-proprietary, policy-making capacity because *Pennington* itself involved an attempt to influence the TVA to restrict its

spot purchases of coal, a purely commercial decision guided by economic criteria. The Court disagrees. As the decision in *Pennington* makes clear, the thrust of defendants' campaign was to eliminate the competition of smaller coal producers both by persuading the Secretary of Labor to establish a high minimum wage and by convincing the TVA to restrict its purchases of coal from producers who would not be subject to that minimum wage. The decision of the TVA, then, would appear to be based on the Secretary's actions. Rather than being guided by purely economic considerations, the agency would be expected to act in a manner that would be consistent with, and would not undercut, the policy decision reached by the Secretary. Its decision to restrict coal purchases from certain producers, therefore, would appear to incorporate policy and political considerations as well as economic considerations. *See Whitten, supra,* 424 F.2d at 32 n. 7.

S.Ct. 920, 86 L.Ed. 1262 (1942); *Bread v. City of Alexandria,* 341 U.S. 622, 641–643, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). Moreover, the First Amendment does not prevent government from adopting reasonable rules for regulating the conduct of those who seek its favor. *United States v. Harriss,* 347 U.S. 612, 625–626, 74 S.Ct. 808, 98 L.Ed. 989 (1954)." *Id.* at 33–34.

The Court of Appeals for the District of Columbia Circuit employed a similar analysis in *Hecht v. Pro-Football, Inc.,* 144 U.S. App.D.C. 56, 444 F.2d 931 (1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). In that case, an unsuccessful prospective purchaser of a professional football team brought suit under the Sherman Act against the Washington Redskins, the National Football League, and the District of Columbia Armory Board, the agency entrusted with managing R.F.K. Stadium in Washington, D.C. The gist of the complaint was that defendants had conspired to restrain and monopolize the business of professional football by seeking and obtaining inclusion of a covenant in the stadium lease that prohibited the use of the stadium by any professional football team other than the Redskins for a period of 30 years.

In an opinion based primarily on *Parker,* the Court concluded that defendants were not outside the reach of the antitrust laws. The Court also rested its conclusion, at least in part, on the distinctions set forth in *Whitten. See* 444 F.2d at 940–941. In this part of its opinion the Court agreed that where the governmental agency is not in a position to make governmental policy, but is "obligated to carry out the policy as already made, * * * the rationale of *Noerr-Pennington,* guaranteeing access of private parties in combinations which would otherwise be illegal under the antitrust laws to influence such agency simply [would] not apply." *Id.* at 942. *See also Woods Exploration & Pro. Co. v. Aluminum Co. of Amer.,* 438 F.2d 1286, 1298 (5 Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) ("action designed to influence policy * * * is all the *Noerr-Pennington* rule seeks to protect") *Oahu*

*Gas Serv., Inc. v. Pacific Resources, Inc.,* 460 F.Supp. 1359, 1384–1385 (D.Hawaii 1978) ("if [defendants'] actions are not directed toward achieving a political result or affecting public policy, the *Noerr-Pennington* protections may not apply * * *").

The third case relied upon by plaintiffs in support of the "commercial activity" exception is *Sacramento Coca-Cola Bot. Co. v. Chauffeurs Loc. 150,* 440 F.2d 1096 (9 Cir.), *cert. denied,* 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971). There, a bottler and seller of soft drinks and a concessionaire and vendor of soft drinks sued the local, national, and international organizations of the Teamsters union, alleging that "due to threats, duress and other coercive measures exercised by the defendants upon the California State Fair officials, these officials issued a directive forbidding the sale of any Coca-Cola upon the fairgrounds during the 1966 State fair." *Id.* at 1096. Like *Hecht, Sacramento Coca-Cola* was *not* decided on the ground that *Noerr-Pennington* is inapplicable to defendants who conspire to influence governmental bodies engaged in purely commercial decisionmaking. Rather, the Court of Appeals for the Ninth Circuit found *Noerr-Pennington* inapplicable because the doctrine did not extend to attempts to influence public officials "by means of threats, intimidation and other coercive measures." *Id.* at 1099. However, in reaching this result the Court expressly relied upon the First Circuit's conclusion that the exemption is limited to instances where the " 'attempt to influence a public official is the kind of political activity which *Noerr* protects.' " *Id.* at 1099, *quoting Whitten, supra,* 424 F.2d at 33. Accepting the First Circuit's view that attempts to influence "purely commercial dealings" are one type of political influence that *Noerr* does not protect, the Court concluded that attempts to influence through "threats and other coercive measures" are another. *Ibid.* In addition, the Court stressed that "[t]he basic thrust of [the Noerr and Pennington] decisions is political." *Ibid.*

Finally, this Court notes that the District Court for the District of Columbia has

recently followed *Whitten, Hecht* and *Sacramento Coca-Cola* in a case where defendants were alleged to have influenced federal procurement decisions. *See General Aircraft Corp. v. Air America,* 1979–1 Trade Cases, ¶ 62,452, p. 76,672 (D.D.C. January 30, 1979). Noting that "[c]ourts have been reluctant to apply the *Noerr-Pennington* doctrine to attempts to influence government bodies acting in purely commercial matters such as procurement," the Court in *General Aircraft Corp.* concluded that "[i]n reaching a decision not to purchase plaintiff's products and services, none of the government entities acted in either a legislative, adjudicatory or administrative capacity so as to place defendant's actions within the reach of the *Noerr-Pennington* exception." *Id.* at 76,675–76,676.

Defendants do not dispute that these courts have impressed a "commercial activity" limitation upon *Noerr-Pennington.* Nor have they distinguished the great number of cases that have, at least in *dicta,* approved the *Whitten* line of analysis. *See, e.g., Council for Employment v. W H D H Corp.,* 580 F.2d 9, 12 & n. 11 (1 Cir. 1978), *cert. denied,* 439 U.S. 978, 99 S.Ct. 561, 58 L.Ed.2d 648 (1979); *Kurek, supra,* 557 F.2d at 592–593 n. 10, 593–594; *Security Fire Door Co. v. County of Los Angeles,* 484 F.2d 1028, 1030 n. 2 (9 Cir. 1973); *Israel v. Baxter Laboratories, Inc.,* 151 U.S.App.D.C. 101, 105, 466 F.2d 272, 276 (1972); *Woods, supra,* 438 F.2d at 1298; *Czajkowski v. State of Illinois,* 460 F.Supp. 1265, 1279 (N.D.Ill. 1977). *See also* Comment, *Whitten v. Paddock,* The Sherman Act and the "Government Action" Immunity Reconsidered, 71 Colum.L.Rev. 140, 151 (1971); Note, Application of the Sherman Act to Attempts to Influence Government Action, 81 Harv.L. Rev. 847, 852–854 (1968). They merely argue that this limitation is not soundly based, particularly in light of recent Supreme Court cases. The Court does not agree.

Defendants' primary contention is that *Whitten,* and the cases following it, rest on the supposition that "[t]he First Amendment does not provide the same degree of protection to purely commercial activity that it does to attempts at political persuasion." *Whitten, supra,* 424 F.2d at 33. This distinction, according to defendants, is no longer valid in light of the recent line of Supreme Court cases that purportedly "put 'commercial' speech, that is, speech directed entirely to effecting a commercial transaction, on the same First Amendment footing as 'political' speech." Memorandum in Support of Defendants' Joint Motion for Summary Judgment, at 67, *citing First National Bank v. Bellotti,* 435 U.S. 765, 783–874 n. 20, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *Bates v. State Bar of Arizona,* 433 U.S. 350, 363, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 91, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Virginia State Board of Pharmacy v. Virginia Consumer Council, Inc.,* 425 U.S. 748, 770, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). Because the basis of the distinction no longer holds true, according to defendants, the distinction itself should be disregarded.

Before addressing the merits of this argument, the Court feels compelled to note that two of the cases relied upon by plaintiffs arose *after* the Supreme Court "commercial speech" cases cited by defendants. The first of these cases is *General Aircraft Corp., supra,* 1979–1 Trade Cases, ¶ 62,452, p. 76,672, decided in January 1979, in which the District Court for the District of Columbia reaffirmed the validity of the *Whitten* line of cases and the commercial/governmental distinction. The second case is *Chestnut Fleet Rentals, Inc. v. Hertz Corp.,* Civ.Action No. 75–1889 (E.D.Pa. Sept. 20, 1978). Interestingly enough, *Chestnut Fleet Rentals* arose out of the same factual setting as some of the cases now before this Court. The court there, ruling in the fall of 1978, rejected defendants' position, holding that

"the decisions of the governmental authorities in the matters complained of were of a commercial nature, not of a governmental nature. Thus, the decisions are made based upon economic cri-

teria, and according to *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25 (1st Cir. 1970), such conduct is not protected by the *Noerr-Pennington* doctrine of antitrust immunity. *See also Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286 (5th Cir. 1971), *Hecht v. Pro-Football, Inc.,* [144 U.S.App.D.C. 56] 444 F.2d 931 (D.C. Cir. 1971) and *Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters and Helpers Local No. 150, et al.,* 440 F.2d 1096 (9th Cir. 1971)." Memorandum and Order at p. 2.

Although this Court does not find that *Chestnut Fleet Rentals* has collateral estoppel effect as to all defendants and with regard to all airports involved in the current litigation,[10] it does appear that the Eastern District of Pennsylvania had an opportunity to consider defendants' argument that *Whitten* is no longer applicable. In conjunction with *General Aircraft Corp.,* the case certainly suggests that the *Whitten* line of cases remains valid and that defendants' arguments are not well founded.

### a. The Principles Underlying Noerr-Pennington

Before analyzing and defining the contours of the commercial activity exception to *Noerr-Pennington,* the Court must address the issue of whether *Noerr-Pennington* is a doctrine based on statutory construction of the Sherman Act or whether it is based on an interpretation of the First Amendment. If the former, the Court's analysis would center on the extent to which Congress intended all lobbying activities to be exempt from the Act, regardless of the commercial or governmental nature of the decision being sought. If the latter, the Court's analysis would focus on whether the First Amendment protects speech directed at influencing government officials acting in a commercial capacity, when that speech would otherwise constitute conspiratorial conduct prohibited by the Sherman Act.

In *Noerr,* the Supreme Court strongly suggested that its exemption was the result of statutory construction. Although it referred to the right of petition as an essential underpinning of its analysis, 365 U.S. at 137, 81 S.Ct. 523, the thrust of the Court's reasoning was that the Sherman Act could not have been intended to "prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly," *id.* at 136, 81 S.Ct. at 529, because such a result would "impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever *in the legislative history of that Act.*" *Id.* at 137, 81 S.Ct. at 529 (emphasis added). Moreover, the Court explicitly refrained from considering respondents' contention that their challenged activities were constitutionally protected by the First Amendment, stating that "Because of the view we take of the *proper construction of the Sherman Act,* we find it unnecessary to consider any of these other defenses." *Id.* at 132 n.6, 81 S.Ct. at 527 n.6 (emphasis added).

The sureness with which the Supreme Court stated the basis for its decision in *Noerr* was not challenged in *Pennington,*[11] but in *California Motor* the Court took a considerably more restrictive position. Relying on the First Amendment underpinnings of *Noerr,* the Court predicated its entire analysis on the tension between the right to petition as guaranteed by the First Amendment and the Congressional prohibi-

---

10. The *Chestnut Fleet Rentals* case was reconsidered four and one-half months after it was decided. At that time, the court granted defendants' summary judgment motion "upon a finding that there was no causal connection between defendants' alleged antitrust violations at the nine airports involved in this litigation and plaintiffs' inability to obtain on-airport concessions, an issue not previously argued or de-cided." Order dated February 5, 1979 (E.D.Pa. Civ.Action No. 75–1889).

11. In an interim case, however, *Continental Ore Co., supra,* the Court read *Noerr* as having rested on the need to avoid "serious constitutional barriers" to enforcement of the Sherman Act. 370 U.S. at 707, 82 S.Ct. 1404.

tion on anticompetitive restraints of trade. This perspective was particularly evident in the Court's statement:

"We conclude that *it would be destructive of rights of association and of petition* to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-à-vis* their competitors." 404 U.S. at 510–511, 92 S.Ct. at 612 (emphasis added).

Moreover, in developing the "sham" exception the Court focused not on Congressional intent, but on the limits of the First Amendment. For example, it stated:

"Petitioners['] * * * right of access to the agencies and courts * * * is part of the right of petition protected by the First Amendment. Yet that does not necessarily give them immunity from the antitrust laws.

"It is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *Id.* at 513–514, 92 S.Ct. at 613.

And

"First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' [citation omitted] which the legislature has the power to control." *Id.* at 515, 92 S.Ct. at 614.

■ The Court concludes from its reading of *California Motor,* which is the most recent case setting forth the conceptual framework of *Noerr-Pennington,* that the doctrine represents a First Amendment limitation on the scope of the Sherman Act. *Accord, California Motor, supra,* 404 U.S. at 516–517, 92 S.Ct. 609 (Stewart, J., concurring); *see* Handler, Twenty-Five Years of Antitrust, 73 Colum.L.Rev. 415, 434–435 (1973). The Court finds considerable legal support for this conclusion. *See, e. g., City of Lafayette, supra,* 435 U.S. at 399–400 n.17, 98 S.Ct. 1123; *Continental Ore Co., supra,* 370 U.S. at 707–708, 82 S.Ct. 1404;

*Subscription T.V. v. Southern Cal. Theatre Owners,* 576 F.2d 230, 233 (9 Cir. 1978); *Kurek, supra,* 557 F.2d at 593–594; *Whitten, supra,* 424 F.2d at 29 n.4; *General Aircraft Corp., supra,* ¶ 62,452 at 76,675; D. Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Bases and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80, 95–96 & n.89 (1977). *But see Cow Palace Ltd. v. Associated Milk Producers,* 390 F.Supp. 696, 700–702 (D.Colo.1975). As a result, the Court's inquiry must be directed to the question of whether defendants can successfully attack the *Whitten* line of cases by arguing that the First Amendment prohibits all restraints on a private party's efforts to influence government officials, regardless of whether the government officials are acting in a proprietary or a governmental capacity.

### 2. First Amendment Analysis

■ There are two responses to defendants' contention that *Whitten* has been undercut by the recent line of Supreme Court "commercial speech" cases. First, although the Court has concededly elevated commercial speech to a level that more closely approximates the level enjoyed by political speech, it has certainly not merged the two. To the contrary, the Court has stressed that commercial speech, even more than political speech, may be regulated in the face of a compelling government interest. Second, although one of the sources of the First Circuit's First Amendment analysis in *Whitten* was a somewhat discredited line of freedom of speech cases, that court also relied on *United States v. Harriss, supra,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989, a case standing for the proposition that Congress may restrict the right to petition where such restriction is necessary to protect the public against a substantive evil.

### a. Commercial Speech

Despite defendants' suggestion to the contrary, commercial speech is not "on the same First Amendment footing" as political speech. Rather, because commercial speech is often easier to verify than political

speech, and because—due to the financial incentives of commercial "speakers"—commercial speech is often "hardier" than political speech, the Supreme Court has retained a distinction between the two. *See, e. g., Bates v. State Bar of Arizona,* 433 U.S. 350, 380–381, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Linmark Assocs., Inc. v. Town of Willingboro,* 431 U.S. 85, 98, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Va. State Bd. of Pharmacy v. Va. Citizens Consumers Council, Inc.,* 425 U.S. 748, 771–772 & n.24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Moreover, while the First Amendment grants "a limited measure of protection" to commercial speech, "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1919, 56 L.Ed.2d 444 (1978); *see Savage v. Commodity Futures Trading Comm'n,* 548 F.2d 192, 197 (7 Cir. 1977).

The power of a state to regulate commercial speech in the face of a potential "evil" was most recently affirmed in *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), a case involving a challenge to a Texas statute that prohibited the practice of optometry under a trade name. The Court recognized that a trade name is "a form of commercial speech that has no intrinsic meaning" and "conveys no information about the price and nature of the services offered * * *." 440 U.S. at 12, 99 S.Ct. at 895. As a result, "there is a significant possibility that trade names will be used to mislead the public." *Ibid.* Because the Court found that "the State's interest in protecting the public from the deceptive and misleading use of optometrical trade names" was strong enough to override any First Amendment protection afforded that type of commercial speech, it held that the challenged statute was constitutional. *Id.* at 15, 99 S.Ct. at 897. *Friedman* is thus fully consistent with previous authority indicating that a state may regulate commercial speech when it has a "substantial and well-demonstrated" interest in doing so to protect the public. More-

over, *Friedman* reaffirms that a court should scrutinize commercial speech with greater care than it should scrutinize political speech in determining whether there is a valid governmental justification for regulation.

■ Congress's primary purpose in enacting the antitrust laws was to protect the public against anticompetitive restraints of trade, or, as the Supreme Court has put it, in "preserving free and unfettered competition as the rule of trade." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). The issue before this Court is whether that governmental interest is sufficiently strong to warrant imposition of restrictions on commercial speech, i. e., attempts to influence public officials in the exercise of non-policy-making, proprietary functions, even though it may not be strong enough to warrant imposition of restrictions on political speech, i. e., attempts to influence public officials in the exercise of non-commercial, governmental functions. The Court finds that it is.

■ As the Supreme Court noted in *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972):

"Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy. Cf. *United States v. Philadelphia National Bank,* 374 U.S. 321, 371, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963)." 405 U.S. at 610, 92 S.Ct. at 1135.

This is strong language indicating an equally strong government interest in protecting the public and the public economy by maintaining free competition as the rule of trade. Although it must yield to the First Amendment rights of speech and petition when the government is acting in a policy-making capacity, the Court concludes that when commercial speech is involved—when defendants are seeking to influence the purely commercial functions of government—the governmental interest in maintaining the integrity of the antitrust laws must take precedence.

■ "Immunity from the antitrust laws is not lightly implied." *California v. Fed. Power Comm'n,* 369 U.S. 482, 485, 82 S.Ct. 901, 903, 8 L.Ed.2d 54 (1962); *see also City of Lafayette, supra,* 435 U.S. at 399, 98 S.Ct. 1123 ("overarching and fundamental" policies represented in antitrust laws argue against implied exclusions). Because of the strength of the governmental interest involved, and because of the Supreme Court's recognition that greater restrictions may be placed on commercial speech than on political speech, the Court holds that when the government is acting in a purely commercial capacity, as, for example, a buyer or seller of goods, the antitrust laws should be applied as though plaintiffs had alleged a conspiracy to influence a large commercial customer in its commercial decisionmaking. Given the broad intrusion of government into our everyday economic affairs, and given the "potential of serious distortion of the rational and efficient allocation of resources" that results from the independent economic decisions of governmental bodies, *see City of Lafayette, supra,* 435 U.S. at 408, 98 S.Ct. at 1134, a blanket application of *Noerr-Pennington* to all attempts to influence government officials would be unwarranted.

### b. *Harriss*

The validity of the Court's balancing approach to *Noerr-Pennington* is supported by the Supreme Court's similar approach to cases involving the right to petition, the First Amendment right that lies at the heart of the *Noerr-Pennington* doctrine. One example of this approach is *United States v. Harriss, supra,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989, one of the cases upon which the First Circuit relied in *Whitten.* In *Harriss,* the Supreme Court heard a challenge to the constitutionality of the Federal Regulation of Lobbying Act, legislation that required Congressional lobbyists to register and periodically to file reports listing expenditures made to influence the passage or defeat of legislation. *Id.* at 614, 74 S.Ct. 808. Recognizing that this statute infringed upon defendants' right to petition and right to freedom of speech, the Court nonetheless felt constrained to balance that infringement against the acknowledged "evil" that Congress sought to prevent. Because of its deference to Congressional concern that "the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal," *id.* at 625, 74 S.Ct. at 816, the Court upheld the statute.

■ It is significant that the Court did not distinguish between the right to petition and the right to freedom of speech in its analysis. Nonetheless, this is not surprising. The Court generally does not distinguish the right to petition from other First Amendment rights. *See, e. g., United Mine Workers of America v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945); D. *Fischel, supra,* 45 U.Chi.L.Rev. at 81 & n.13. Perhaps this is because the values expressed by these rights—ensuring that the public and the government possess all information necessary for informed decisionmaking—are so similar. *Compare Noerr, supra,* 365 U.S. at 137, 81 S.Ct. 523, *with Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1944). Whatever the reason, it supports this Court's determination that the restrictions that may be placed on freedom of speech are roughly comparable to the restrictions that may be placed on the right to petition.

The Court's analysis cannot stop here, however, because the right to petition seems to be subject to even greater restrictions than the right to freedom of speech. These restrictions are suggested most strongly by *California Motor, supra.*

In *California Motor,* the Court reaffirmed the broad proposition that the right to petition is not absolute. However, it went further and indicated that the scope of the permissible restrictions on that right depends in part on the nature of the government forum being petitioned. In the administrative forum, where greater restrictions may be imposed than in the legislative forum that was the focus of *Noerr,* a private party has no First Amendment right to petition the Government by means of perjury, fraud, payment of bribes, or misrepresentations. *See California Motor, supra,* 404 U.S. at 512–513, 92 S.Ct. 609. The Constitution does not protect that type of petitioning. *Accord, Mountain Grove Cemetery v. Norwalk Vault Co.,* 428 F.Supp. 951, 955 (D.Conn.1977) ("[C]orrupt practices that abuse administrative or judicial tribunals can prompt the removal of antitrust immunity").[12] As this Court's discussion of *City of Lafayette* will indicate, *infra,* pp. 1087–1091, this distinction may be critical, insofar as the airport officials allegedly being influenced were representatives of local administrative, adjudicatory bodies. For that reason, defendants' attempts to invoke the First Amendment must be viewed with greater scrutiny than if, for example, they had approached a state legislative body.

■ The Court's analysis of *Noerr-Pennington* and the First Amendment rights upon which it rests can be summarized in four statements. First, the right to petition and to freedom of speech may be restricted in the face of a compelling state interest. *See Giboney v. Empire Storage Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed.

834 (1949). Second, among such compelling interests may be the interest of government in preserving the fundamental policies expressed in the antitrust laws. *See Nat'l Soc. of Prof. Engineers v. United States,* 435 U.S. 679, 696–697, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *City of Lafayette, supra,* 435 U.S. at 400, 98 S.Ct. 1123; *Associated Press v. United States,* 326 U.S. 1, 19–20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *cf. Savage, supra,* 548 F.2d at 197 (First "Amendment does not remove a business engaged in the communication of information from general laws regulating business practices"). Third, this government interest may be given considerably greater weight when commercial speech is involved, that is, when the government activity being influenced is of a commercial rather than a political or policy-making nature. *See Council for Employment, supra,* 580 F.2d at 12; *State of Missouri v. Nat'l Org. for Women,* 467 F.Supp. 289 at 304 (W.D.Mo. 1979); *Oahu Gas Serv., Inc., supra,* 460 F.Supp. at 1384–1385. Fourth, the First Amendment interest may be given less weight when defendants are seeking to petition local governmental units or adjudicatory bodies rather than state or federal legislatures. *See California Motor, supra,* 404 U.S. at 512–513, 92 S.Ct. 609; *Oahu Gas Serv., Inc., supra,* 460 F.Supp. at 1385 (defendants' attempts to influence government officials "are subject to closer scrutiny because they occurred in an adjudicatory setting"). It is this "balancing" analysis, which is fully consistent with the results reached in the *Whitten* line of cases, that the Court must apply in evaluating defendants' *Noerr-Pennington* defense in the cases at bar.

3. *City of Lafayette Analysis*

■ The Court's decision to retain *Noerr-Pennington*'s commercial/governmental distinction is prompted not only by

---

**12.** Moreover, as the "sham" exception to *Noerr-Pennington* indicates, defendants may not assume the mantle of the right to petition to cover activity that is intended, not to influence public officials, but rather to deny "their competitors * * * meaningful access to ad-

judicatory tribunals and so to usurp that decisionmaking process." 404 U.S. at 512, 92 S.Ct. at 612. "[A]ctions of that kind cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" *Id.* at 513, 92 S.Ct. at 613.

its First Amendment analysis but also by its desire for consistent application of the laws. Recent cases following *Parker v. Brown* have established that local government units and their officials are not entitled to "state action" immunity solely by virtue of their governmental status. Rather, their immunity depends on the degree to which their anticompetitive activities were undertaken to implement state policy. In light of this limitation, the Court is concerned that rejection of the commercial/governmental distinction would lead to the anomalous result that where a municipality is engaged in commercial activity, but is not implementing a state "anticompetitive" policy, the decisionmaking municipal officials would be subject to antitrust liability even though the private parties who prompted their anticompetitive conduct would not, simply because the private parties sought to influence "government officials."

In *City of Lafayette, supra,* the Supreme Court reaffirmed that municipalities are not automatically exempted from the antitrust laws by *Parker.*[13] It is significant that the Court's decision in part rested on its concern that these independent decisionmaking bodies might have a potentially disruptive effect on the national economy:

"When [municipalities and other local units of government] act as owners and providers of services, they are fully capable of aggrandizing other economic units with which they interrelate, with the potential of serious distortion of the rational and efficient allocation of resources, and the efficiency of free markets which the regime of competition embodied in the antitrust laws is thought to engender." 435 U.S. at 408, 98 S.Ct. at 1134. Although principles of federalism require that states themselves be permitted to engage in such anticompetitive economic conduct, a plurality of the Court held that "[i]n light of the serious economic dislocation which could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws * * *," the *Parker* doctrine must be limited to exempt "only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 412–413, 98 S.Ct. at 1137. The Court therefore placed a significant limitation on the extent to which each local governmental unit could pursue its independent economic policies and still remain exempt from the scope of the antitrust laws.

In the second case, *Bates,* the Court reached the opposite result, extending the *Parker* exemption to a state bar association that helped enforce a rule prohibiting attorney advertising. The primary difference between *Goldfarb* and *Bates* was that in the latter case, the challenged activity was directed and authorized by the State Supreme Court; the prohibition against legal advertising was "a clear articulation of the State's policy with regard to professional behavior" and was "subject to pointed re-examination by the policy-maker—the Arizona Supreme Court—in enforcement proceedings." 433 U.S. at 362, 97 S.Ct. at 2698. As the Court later stated:

> "We emphasized [in *Bates*] the significance to our conclusion of the fact that the state policy requiring the anticompetitive restraint as part of a comprehensive regulatory system, was one clearly articulated and affirmatively expressed as state policy, and that the State's policy was actively supervised by the State Supreme Court as the policymaker." *City of Lafayette, supra,* 435 U.S. at 410, 98 S.Ct. at 1135.

---

**13.** This result followed naturally from the Court's earlier decisions in *Goldfarb v. Va. State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), and *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). In *Goldfarb,* the Court rejected a state bar association's claim that its publication and enforcement of minimum-fee schedules for lawyers was exempted state action. The Court noted that no state statute referred to lawyers' fees or minimum-fee schedules and that the State Supreme Court did not require either the use of, or adherence to, minimum-fee schedules. For these reasons, it concluded that the fee-setting was not an act of government performed by the State acting as sovereign. 421 U.S. at 791, 95 S.Ct. 2004. "The State Bar, though acting within its broad powers, had 'voluntarily joined in what is essentially a private anticompetitive activity,' * * * and was not executing the mandate of the State." *City of Lafayette, supra,* 435 U.S. at 410, 98 S.Ct. at 1135, *quoting Goldfarb, supra,* 421 U.S. at 792, 95 S.Ct. 2004.

The Chief Justice, in a concurring opinion that is of particular interest to this Court, agreed with the general conclusions of the plurality but focused more specifically on the commercial nature of the municipal activity being challenged. He indicated that the commercial activities of a municipality should be treated no differently than the commercial activities of private entities, stating:

> "This case turns, or ought to, on the District Court's explicit conclusion, unchallenged here, that '[t]hese plaintiff cities are engaging in what is clearly a business activity; activity in which a profit is realized.' There is nothing in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), or its progeny, which suggests that a proprietary enterprise with the inherent capacity for economically disruptive anticompetitive effects should be exempt from the Sherman Act merely because it is organized under state law as a municipality." *Id.* at 418, 98 S.Ct. at 1139 (footnote omitted).

He concluded that when municipalities are engaged in commercial or proprietary activity, that is, the same type of activity any other "entrepreneur in the economic community" might engage in, they should be subject to the antitrust laws absent a "strong showing" that the state "compelled" the challenged activity and that this compulsion was "essential" to the state's regulatory plan. *Id.* at 425–426 & n.6, 98 S.Ct. 1123.[14] *See also Czajkowski v. State of Illinois,* 460 F.Supp. 1265, 1279–1280 (N.D.Ill.1977) ("the state action exemption is more likely to be applied where the plaintiffs' claim is directed against a public * *´* rather than a private party, * * * where the challenged activities flow from an affirmative command of the legislature rather than the acquiescence of a state regulatory agency, * * * where the governmental unit concerned is the state itself rather than [a] municipality or other subordinate state governmental body, * * * and where the state program is enacted for the public good rather than to further private financial objectives.").

Because the Supreme Court has declared that municipalities and their officials are subject to antitrust liability when their activities are not necessary to implement state policies—and because of the suggestion that municipalities engaging in commercial activities are often not acting pursuant to articulated state policies—an interpretation of *Noerr-Pennington* that rejected the commercial/governmental distinction would be likely to lead to inequitable results. Perhaps the most obvious example of this would be the situation where private parties had influenced a municipal body to engage in a purely commercial, anticompetitive activity that was either contrary to state policy, or at least not related to state policy. Under *City of Lafayette,* this type of activity would subject the municipality and its officials to potential liability under the antitrust laws. Yet if *Noerr-Pennington* were interpreted to immunize efforts by private parties to influence *any* type of governmental decisionmaking, the private parties who instigated such activity would themselves be immune from the antitrust laws. While it is true that *Noerr-Pennington* and *Parker v. Brown* are legal doctrines rooted in very separate principles—the right to petition versus sovereign immunity and federalism—the Court feels constrained to consider their practical interrelation in order to avoid potentially inequitable or anomalous results.[15] And it certainly seems inequitable to hold a municipal official lia-

---

**14.** This Court is certainly mindful of Justice Stewart's well-reasoned opinion in dissent in *City of Lafayette. See id.* at 426–441, 98 S.Ct. 1123. However compelling that opinion might be, though, this Court, as a District Court, must base its analysis on the opinion of the plurality.

**15.** This is not at all a novel idea. In fact, one of the bases of the Supreme Court's decision in *Noerr* was its earlier holding in *Parker* that

"where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out." *Noerr, supra,* 365 U.S. at 136, 81 S.Ct. at 529. The Court is therefore not breaking new ground in suggesting that the reach of *Noerr-Pennington* may be limited to cases in which the Government's conduct would itself be immunized. *See infra,* at 1090–1091.

ble for actions he took at the urging of a private party while ruling that the private party is immune solely because it acted through the agency of that municipal official.[16] *Cf. Duke & Co., Inc. v. Foerster,* 521 F.2d 1277, 1282 (3 Cir. 1975) (*Noerr-Pennington* inapplicable. where private parties and public officials are alleged to be co-conspirators); *Harman v. Valley Nat'l Bank,* 339 F.2d 564, 566 (9 Cir. 1964) (same). For these reasons, it seems appropriate to restrict the *Noerr-Pennington* doctrine to attempts to influence government officials who are engaged in activity that would be protected from the reach of the antitrust laws.

The Court of Appeals for the Seventh Circuit appeared to be influenced by this same desire to interpret *Parker* and *Noerr* in a consistent fashion in *Kurek, supra,* 557 F.2d 580. At issue in *Kurek* was whether the antitrust laws would apply to a park district and one of its concessionaires which allegedly conspired to coerce the concessionaires's competitors into raising and fixing retail prices. 557 F.2d at 585–587. After a lengthy discussion of the Park District's statutory authority to engage in the challenged activity, the Court concluded that the District was not entitled to a *Parker* defense, because

"[n]othing in the Illinois statutory provisions governing park districts even remotely suggests that Illinois has authorized, let alone compelled, park districts to

attempt to enrich themselves by coercing horizontal retail competitors operating under concession licenses to fix retail prices in what would otherwise be plain violation of the Sherman Act." *Id.* at 590.

Having disposed of the District's state action defense, the Court focused its attention on the *Noerr-Pennington* issue. That issue was based on the private concessionaire's presentation to the Park District of a "sham" proposal that would be used by the District to coerce the other concessionaires into the illegal price-fixing activity. *Id.* at 593. Resting rested its conclusion in part on its previous *Parker* analysis, the Court held that *Noerr-Pennington* offered no defense:

"Our determination [under *Parker*] that the Park District and its officials had no state mandate or authority to engage in the activities attacked here necessarily reduces the applicability of the reasoning of *Noerr* to the degree it is based on the need of the governmental units for citizens input in making decisions that *Parker* holds to be outside the scope of the Sherman Act." *Id.* at 593.

That is, the Court found that the rationale of *Noerr-Pennington* would not extend to attempts to influence government officials acting in a manner that was not protected "state action" under *Parker*.[17] *Accord, Hu-*

---

**16.** Retention of the commercial/governmental distinction would make just as much sense if the challenged action, although of a commercial nature, were performed by the state acting as sovereign. In that case, under *City of Lafayette* and *Parker,* neither the state nor its officials would be subject to antitrust liability. Moreover, although the private parties may have been influencing "commercial" activity of the state, they would probably escape liability as well, thus averting the type of anomalous result with which this Court is concerned. As one court has stated:

"[I]t should be noted that the only conduct of the [private] defendants * * * alleged to have been in violation of the antitrust laws had to do with their dealings with the Authority in the exercise of a governmental function. If, as we have found, the Authority's conduct was lawful here it would be an unreasonable restriction on its freedom to

hold that the other defendants acted illegally in having aided it." *E. W. Wiggins Airways, Inc. v. Mass. Port Authority,* 362 F.2d 52, 56 (1 Cir.), *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); *see also Saenz v. University Interscholastic League,* 487 F.2d 1026, 1028 (5 Cir. 1973).

**17.** The same court had adopted the correlative of that principle in *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220 (7 Cir. 1975). First, it held that a city council was entitled to *Parker* immunity because its decision to grant a monopolistic cable television franchise to plaintiff's competitor had been made in direct conformity with articulated state policy. *Id.* at 228–229. Then, it concluded that "[s]ince the governmental actions of the city council and its committees were not themselves subject to the Sherman Act, the same was true under *Noerr* of concerted efforts to induce those government actions * * *." *Id.* at 229.

ron Valley Hospital, Inc. v. City of Pontiac, 466 F.Supp. 1301 at 1315 (E.D.Mich. March 2, 1979) (" * * * Noerr-Pennington immunity presupposes Parker v. Brown immunity: if the governmental or agency action is valid as under state authority (despite anticompetitive effects), then seeking to influence the action and a successful outcome are also exempt").

 There are two conclusions that can be drawn from the Court's City of Lafayette analysis. First, whenever possible, the Noerr-Pennington doctrine should be applied in a manner that is consistent with Parker; that is, the courts should be reluctant to extend immunity to private parties who have sought to influence government activity that would not be protected under the state action doctrine. Second, in evaluating whether the governmental activity would be unprotected (and indirectly, whether the private parties who sought to influence it should be subject to the antitrust laws), the courts should consider the extent to which the governmental body is a subordinate unit of the state, acting in its own parochial interest rather than in the interest of implementing a particular state-policy, and it should also consider the extent to which the governmental body is performing a commercial function comparable to the functions performed by other large entities making decisions in the market place.

### 4. Summary of Legal Analysis

 The Court recognizes that its First Amendment right to petition analysis and its City of Lafayette state action analysis do not exactly coincide. Nonetheless, some broad conclusions can be drawn from the two lines of authority. Foremost among these is the conclusion that a private party cannot be granted Noerr-Pennington immunity solely on the basis of having been part of a joint effort to influence government officials. Although there can certainly be no Noerr-Pennington immunity without such an effort, once an attempt to influence government officials has been found, there remain at least two other issues for the courts to consider.

First, the courts must ask whether the public officials allegedly being influenced were acting in a commercial or a governmental capacity. As Whitten and this Court's First Amendment analysis indicate, a private party's right to petition the government for redress of grievances must yield to the compelling governmental interests expressed in the antitrust laws when the public body being "petitioned" is acting as a commercial entity influenced by economic concerns rather than as a policymaking unit of government. This need to differentiate between the commercial and the governmental functions of government officials is reinforced by City of Lafayette, particularly Chief Justice Burger's analysis, which indicates that the antitrust laws may apply with greater force to governmental units acting in an independent commercial capacity.

Second, the Court must ask what type of governmental body is being petitioned and how many levels removed it is from the legislature. As noted in California Motor, supra, a party's right to petition may be subject to closer scrutiny when the object of the petition is an administrative rather than a legislative body. Moreover, in order to be consistent with the state action doctrine as developed in City of Lafayette, a party's right to petition may be subjected to greater controls when the object of the petition is a local governmental body, particularly when it is acting as an independent economic entity rather than as an agent of state "anticompetitive" policy.

As Justice Stewart suggested, dissenting in City of Lafayette, there is no clear line dividing the "proprietary" from the "governmental" activities of a governmental body. See 435 U.S. at 433–434, 98 S.Ct. 1123. But this Court must conclude that as the decisionmaking function of a governmental body becomes more commercial, focusing on economic criteria rather than on policy considerations, and as the decisionmaking body becomes further removed from the legislative forum in the sense that it is either an administrative or adjudicato-

ry body or an independent unit not carrying out state policy, the *Noerr-Pennington* doctrine must offer correspondingly less protection to the private parties who seek to assert their influence. The mere fact that the object of their influence is a government official should not be cause for granting an exemption from the antitrust laws.

### C. Application of the Commercial Activity Exception: The Test Airports

There is only an element left to this Court's analysis, but it is by far the most important. To this point, the Court has been concerned with whether a "commercial activity" exception to *Noerr-Pennington* even exists. Now that it has resolved that issue, and has further sought to outline the dimensions of the exception, the Court must turn to the cases at bar and determine the validity of defendants' argument that the local airport officials they allegedly influenced were engaged in "governmental activity."

■■ Defendants' argument is based on a number of factors. First, they point to state statutory enabling provisions that authorize the creation of local airport authorities. Next, they refer to deposition testimony indicating that the operation of each test airport was guided by the primary goal of public service, and that in deciding to restrict entry onto the airport car rental market the local officials were making policy decisions based upon consideration of the public need, the available space, and the airport's revenue needs. Finally, they note that airport operation and management have been characterized as a government function by various statutes and court decisions. *See* Defendants' Joint Motion for Summary Judgment (*Noerr-Pennington* and Causation), at 6–7.

Plaintiffs, on the other hand, argue that the decisions of the local airport officials regarding the awarding of car rental concessions, like the decision as to which swimming pool specifications to adopt in *Whitten,* which soft drink concession to award in

*Sacramento Coca-Cola,*[18] and which aircraft to purchase in *General Aircraft Corp.,* were decisions characterized by their proprietary rather than their governmental nature. Plaintiffs contend that the airport officials had no legislative mandate to make decisions having an anticompetitive effect and that the car rental concession decisions were made, not to institute any governmental policy, but merely to maximize the airport's revenues. Business judgment rather than the interests of the public was alleged to have been the touchstone of the decision-making process.

The Court has given careful consideration to the arguments raised and the authorities cited by all parties. Although there is some appeal to defendants' contention that the local airport authorities were acting merely as governmental officials engaged in a policymaking function, the Court must deny defendants' summary judgment motion as to all three airports. Because of the nature of the governmental decisionmaking bodies, the extent of their legislative mandate, and the factors entering into their decisionmaking process, the Court is unable to conclude that the airport authorities were functioning in a "governmental" capacity.

### 1. Defendants' Cases

Before discussing the particular facts at each of the test airports, the Court must address defendants' contention that a finding of "governmental activity" is compelled by prior case law. Defendants rely on three cases in making this argument. None are controlling.

In *Mark Aero, Inc. v. Trans World Airlines, Inc.,* 580 F.2d 288 (8 Cir. 1978), the only case cited by defendants that involved application of *Noerr-Pennington* to an attempt to influence airport officials, a private air taxi operator sought to have Kansas City Municipal Airport reopened so that it could offer air passenger service between Kansas City and St. Louis. Allegedly because of the influence of defendant air carriers, the local airport authority denied this request. Shortly thereafter, plaintiff sued

---

**18.** *But see supra,* at 1081.

the air carriers under the Sherman Act. Although the district court denied defendants' motion to dismiss, the court of appeals reversed, holding that the air carriers were entitled to *Noerr-Pennington* immunity.

If the decision not to reopen an airport to commercial traffic could be equated with a decision to set restrictive conditions on car rental concessions, the Court might be inclined to find *Mark Aero* controlling. However, the decisions are quite different. As the discussion to follow will indicate, the airport officials in Austin, Denver and Miami apparently made their decisions just as if their airports had been privately owned enterprises; the most significant government policy being implemented involved maximization of revenues. In *Mark Aero,* however, the airport officials considered a wide range of factors, including "the FAA Regional Director's desire to confine all scheduled air carrier operations to Kansas City International." 580 F.2d at 291. They were engaged in a policy-making function, or as the Eighth Circuit put it, they were addressing "a governmental policy question," involving as it did, consideration of "risks to the new airport, risks to airport financing, and a shift in airport activity." *Id.* at 292. Just because *Mark Aero* and the cases at bar involved the decisionmaking of airport officials does not make them indistinguishable. To the contrary, the policy considerations influencing the decision in *Mark Aero* makes that case quite distinguishable from the actions before this Court.

The other cases relied upon by defendants are even less compelling. The first involved a local airport authority's decision to grant an exclusive taxicab franchise to a private company. *See Padgett v. Louisville and Jefferson County Air Board,* 492 F.2d 1258 (6 Cir. 1974). The second involved a local airport authority's decision to grant an exclusive right to conduct fixed base operations to a private company. *See E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority,* 362 F.2d 52 (1 Cir. 1966), *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966). However, neither case involved application of the *Noerr-Pennington* doctrine; they were decided on *Parker v. Brown* grounds. Because these cases were decided before *City of Lafayette,* and because they contained no discussion of the policy aspects of the officials' decisions or of the specific mandate of the state legislature,[19] this Court does not find them to be controlling.[20] As a result, the Court's discussion must turn to the nature of the state mandate and decisionmaking process at each of the airports at issue in the litigation at bar.

### 2. *Austin*

The Robert Mueller Municipal Airport in Austin, Texas, is owned and operated by the City of Austin pursuant to the broad authority vested in it by the Municipal Airports Act, Tex.Civ.Stat.Ann. arts. 46d–1 *et seq.* (Vernon 1969). That statute, which empowers Texas municipalities to "establish, * * * maintain, * * * operate, regulate, protect, and police airports * * *," (art. 46d–2), also grants municipalities the power to

> "enter into contracts, leases and other arrangements for a term not exceeding forty (40) years [for the purpose of] granting the privilege of using * * * such airport * * * or space therein for commercial purposes [or for] supplying goods, commodities, things, services or facilities at such airport * * *." (art. 46d–4(a).)

**19.** In both cases, the courts rested their decisions on the broad legislative mandate to operate and manage the airports in question. 492 F.2d at 1260; 362 F.2d at 55.

**20.** Moreover, even if these cases had been decided in light of *City of Lafayette,* their outcomes would not be controlling here. This Court's earlier discussion of the interrelation between *Parker* and *Noerr* should not be read as a holding that all attempts to influence government officials are immune under *Noerr* so long as the government action itself would be immune under *Parker.* That goes too far. The Court merely indicated that a private party must meet a heavy burden in claiming *Noerr* immunity when it is charged with having influenced government activity that would not itself be protected under the *Parker* doctrine; the converse is not necessarily true.

The Municipal Airports Act also provides that

"the municipality may establish the terms and conditions and fix the charges, rentals or fees for the privileges or services, which * * * shall be established with due regard to * * * the expenses of operation to the municipality." (art. 46d–4(a).)

Since April 22, 1976, Austin has exercised the authority vested in it through a Department of Aviation headed by an appointed Director of Aviation who reports to one of the assistant city managers. *See* Ordinance No. 760422–C, April 22, 1976; Deposition of Roy E. Bayless, at 9; Deposition of Col. Vance E. Murphy, at 7. Prior to that time, Austin had a Director of Aviation but no formal Department of Aviation.

There are four reasons why the Director of Aviation's decision to restrict the number of car rentals concessions at Austin cannot be found to be "governmental" for the purposes of this summary judgment motion. First, as with all the test airports, the decisionmaking body in Austin was a local municipal body acting in a non-legislative capacity. In that respect it was just one of many thousands of local governmental bodies functioning in the national economy. *See City of Lafayette, supra*, 435 U.S. at 407, 98 S.Ct. 1123. Attempts to influence such bodies are not entitled to as much protection as attempts to influence, for example, the state legislatures. *See supra*, at 1087, 1091–1092.

Second, not only did defendants seek to influence a local administrative body, but they sought to influence that body to make decisions that were not necessary to implement any state legislative policy. Although the city was authorized to operate the airport and to lease out commercial space within it, there is no indication that the

legislature intended for the city to do so in a manner that would undercut federal antitrust policies.[21] To the contrary, the Municipal Airports Act specifically states that

"[n]o ordinance, resolution, rule, regulation or order adopted by a municipality pursuant to this Act shall be inconsistent with, or contrary to, any Act of the Congress of the United States or laws of this State, or to any regulations promulgated or standards established pursuant thereto. (art. 46d–7(b) (footnote deleted).)

Under a *City of Lafayette* analysis, then, the local airport authority would probably not be entitled to *Parker* state action immunity for its actions.

This latter conclusion is confirmed by a recent decision denying state action immunity to a Texas municipality that had granted an exclusive taxicab franchise with respect to the Dallas-Fort Worth Municipal Airport. *See Woolen v. Surtran Taxicabs, Inc.*, 461 F.Supp. 1025 (N.D.Tex.1978). In *Woolen* the district court based its *City of Lafayette* analysis on the section of the Municipal Airports Act quoted above, finding that

"the Texas legislature did not contemplate the implementation of anticompetitive activities by municipalities in their operation of airports. While it is conceivable that [art. 46d–7(b)] was not intended to encompass the antitrust laws, its plain meaning cannot be ignored." *Id.* at 1031.

The court reached this result despite its recognition that the state legislature had characterized the operation and regulation of airports as a government function.[22]

The third reason why this Court finds that defendants cannot rely on *Noerr-Pennington* rests on its interpretation of art. 46d–4(b) of the Municipal Airports Act. That section empowers municipalities

---

21. Of course, the Court is not requiring a precisely articulated state policy. Under *City of Lafayette* it is enough that there be found " 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.' " 435 U.S. at 415, 98 S.Ct. at 1138.

22. Art. 46d–15 provides that the
"operation [and] regulation * * * of airports * * * and the exercise of any other powers herein granted to municipalities and other public agencies * * * are hereby declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity * * *."

"by contract, lease or other arrangement * * * [to] grant to any qualified person for a term not to exceed forty (40) years the privilege of operating, as agent of the municipality or otherwise, any airport owned or controlled by the municipality * * *."

In other words, the legislative delegation of the power to manage and operate municipal airports was sufficiently broad to permit operation of the airports by independent private corporations. If one of these corporations were now managing the Austin airport there would be little question but that it was engaged in commercial decisionmaking. Just because the city chose to subdelegate its powers to a quasi-governmental Director of Aviation rather than to a private corporation should not change the Court's perception of the nature of the decisions made.

The fourth reason why the Director of Aviation cannot be found to have engaged in governmental decisionmaking rests on the testimony of one of the directors. Col. Vance E. Murphy, who acted as Director of Aviation from September 1958 through 1973, testified that the Austin airport derived its revenues from its own operations and concessions, and that in running the airport, his decisions regarding allocation of car rental concessions were based on his exercise of "sound business judgment." Deposition of Murphy, at 4, 80–81, 85–86. In fact, as he wrote to the Austin City Council on May 27, 1965,

"Determination of how many and which companies will be permitted to compete for an available market must be based upon a business judgment of what will produce the desired standards of service at rates calculated to attract the greatest public acceptance and volume of use, while at the same time showing a reasonable margin of profit for the operator and providing a fair revenue for the city to help off-set costs of airport operation." Exhibit 106.

This letter indicates that his decisions were guided more by economic criteria than by state-established policy considerations

Perhaps even more telling is Col. Murphy's statement during his deposition that "he would maybe have said the same things and done it the same way if I had been running an airport that was owned by private enterprise * * *." When asked more specifically whether he would have done anything differently had the airport been owned by private enterprise, he responded, "No, I would not. Going back, of course, to the thing that I say, I did it for what I thought was the best interest of the city. I would have done that same thing for the best interest of any private enterprise that I was working for." *Id.* at 87–88.

For these reasons the Court concludes that *Noerr-Pennington* does not immunize defendants' alleged attempts to influence the Austin Director of Aviation to restrict plaintiffs' entry onto the on-airport car rental market. The restrictive decision was made by a subordinate unit of government acting under broad rather than specific legislative authority, and it was made with all the indicia of commercial decisionmaking, apparently for the purpose of maximizing airport revenues. Although defendants have presented some evidence that supports their interpretation of the decisionmaking process, the Court cannot find that this evidence is sufficiently compelling to warrant the granting of the summary judgment motion as to Austin.

### 3. Denver

Stapleton International Airport in Denver, Colorado, is owned and operated by the City of Denver pursuant to authority granted to it by the "home rule" provision of the Colorado Constitution, Article XX. That provision authorizes the City and County of Denver, *inter alia*, "to, maintain, conduct, and operate * * * transportation systems * * * for the use of said city and county and the inhabitants thereof * * *."

The City and County of Denver has established a Department of Public Works, run by an appointed Manager of Public Works who has overall responsibility for the development and operation of the airport

Charter of the City and County of Denver, Article II (Defendants' Denver Deposition, Exhibit 1). More specific authority has been delegated to a Director of Aviation whose duties include "negotiation of contracts with concessionaires." Deposition of Don W. Martin, at 68.

The Court concludes that with respect to Denver, as with Austin, the Directors' decisions regarding access to the on-airport car rental market were not sufficiently "governmental" to support a grant of *Noerr-Pennington* immunity to defendants. First, as in Austin, the decisionmaking authority was a low-level administrative unit of government. The same close degree of scrutiny must therefore be applied to defendants' attempts to assert their influence.

■ Second, applying the *City of Lafayette* analysis, it appears that the Denver Director of Aviation was not carrying out a state mandate to pursue any anticompetitive activities. Although the state legislature did grant "home rule" cities the power to operate transportation systems, there is no indication that the state required, or even suggested, the manner in which the systems were to be operated. *See Woolen, supra,* at p. 1031.[23] A showing of general authority to operate in a particular area is not sufficient under *City of Lafayette* to establish state action.[24]

Third, the City and County of Denver itself evinced a desire that Stapleton Air-

port be managed in a manner that maximized potential revenues, *i. e.,* in a commercial manner. In enacting ordinances for the issuance of revenue bonds, for example, the City has required the airport to maximize revenues from leases and other concession agreements. *See* Exhibit E to Defendants' Motion for Summary Judgment. The 1960 Bond Ordinance provides in part:

"[T]he City hereby covenants that it will continue in effect * * * a schedule of rentals, fees and charges for the use of the Airport as may be necessary or proper in order that the net revenues derived therefrom in each fiscal year will be sufficient to make payments annually into the Bond Fund at least equal to one hundred twenty-five per cent (125%) of the amounts required to be paid into said Fund * * *.

* * * * * *

" * * * That nothing herein contained shall be construed in such a manner as to prevent the City from leasing any part of the Airport * * * to private individuals, firms, or corporations if leasing will not substantially diminish the net revenues otherwise available for the payment of' said bonds; * * * provided that the rents or rates established by any such leases or agreements will be set in such a manner as to provide the *reasonable optimum* net revenues under prevailing economic conditions, but in no

---

**23.** To the extent that *Trans World Assoc. v. City and County of Denver,* 1974–2 Trade Cases ¶ 75,293 (D.Colo. Oct. 15, 1974), compels a different result, this Court declines to follow it. The Court in *Trans World Assoc.* relied on the *Parker* doctrine in holding that the Sherman Act did not reach an alleged conspiracy between the City and County of Denver and private car rental companies to fix car rental prices at Stapleton Airport. The finding of "valid governmental action" was based on Col. Rev.Stat. 5–4–1 (now 41–4–101), which declares that the "operation of airports [is a] public governmental function * * *." However, this Court has just concluded that a broad legislative statement that the general operations of a municipal facility constitute a government function is not dispositive. *See supra,* at ——. The threshold question under the *City of Lafayette* analysis must be whether the specific activity being challenged, *i. e.,* car

rental price fixing, was part of a state policy to substitute regulation or monopoly for competition. *City of Lafayette, supra,* 435 U.S. at 412–413, 98 S.Ct. 1123. *See Woolen, supra,* at p. 1031. Therefore, because this Court can find no Colorado legislative mandate with respect to the challenged governmental activity in the cases at bar, and because of the commercial nature of the government officials' decisionmaking process, the Court concludes that *Noerr-Pennington* immunity is not warranted for defendants, despite the suggestion in *Trans World Assoc.* to the contrary. *See id.* at p. 97,900.

**24.** In that case, for example, the city had general authority to operate a public utility. What it lacked was the specific authority to engage in the anticompetitive operations that were being challenged.

event less than required by [¶ 1] above." (Emphasis added.)

Similar language may be found in the 1964 Bond Ordinance, No. 64, §§ 1001, 1112, and the 1969 Bond Ordinance, No. 100, §§ 1001, 1117. Moreover, § 1108 of the 1969 Bond Ordinance, No. 100, also provides that the City and County of Denver "will administer the Airport in accordance with sound business principles." Defendants' Exhibit 4 to Deposition of Harold Cook.

The Directors of Aviation recognized their fiscal obligations under these bond ordinances and made their decisions accordingly. See, e. g., Michael Deposition at 67. Moreover, one of them not only testified that a major factor in his decisionmaking process was maximization of revenues, but he admitted that his decisions would have been just the same had Stapleton been owned by a private company rather than by the city. See Martin Deposition at 7, 8.[25]

For these reasons, the Court concludes that the local authority's decisions in Denver, as in Austin, were not of a sufficiently governmental policymaking nature as to warrant granting *Noerr-Pennington* immunity to defendants. Again, the decisions were made by a local governmental administrative body, not acting pursuant to a state legislative mandate, in a manner that reflected economic and commercial concerns rather than governmental policy considerations.

#### 4. *Miami*

Miami International Airport in Miami, Florida, is owned and operated by Dade County, which is authorized "[t]o the extent not inconsistent with general or special law, [to p]rovide and operate air * * * terminals * * *." Fla.Stat. 125.01(1)(*1*). Because Dade is a "home rule" county, pursuant to Article VIII, section 6 of the Florida Constitution, it has the power "[t]o * * * maintain * * * and operate any [airport facility and franchise deemed neces-

sary or convenient for the operation thereof]," and "[t]o make and enter into all contracts and agreements and to do and perform all acts and deeds necessary and incidental to the performance of its duties and the exercise of its powers." Fla.Stat. §§ 125.012(1), 125.012(8), 125.011(2). More specifically, it is authorized "[t]o fix, regulate, and collect rates and charges for the services and facilities furnished by [its airport]," *id.* at 125.012(9), "to fix and determine the rates * * * and other charges for the use of * * * airport facilities located within or without the county insofar as it may do so under the state constitution and the constitution and laws of the United States," *id.* at 125.012(10) and "[t]o grant exclusive or nonexclusive franchises to persons, firms, or corporations for the operating of * * * concessions of a nonaeronautical nature in, on and in connection with any [airport facility] owned and operated by the county." *Id.* at 125.012(17).

Dade County exercises this authority through its Director of Aviation. Although the ultimate responsibility for operations at Miami International Airport rests with the Board of County Commissioners, the Director of Aviation is specifically responsible for "the formulation of concessions policy [and preparation] of specifications for submittal to the Board of County Commission[ers] for approval." Deposition of Richard Judy, at 16.

The Court's decision with respect to Miami appears at first to be more difficult than it was with respect to either Austin or Denver. For although the decisionmaking body in Miami was a local governmental unit, and although the decisions of the airport officials appear to be more commercial than governmental, there is some problem with the *City of Lafayette* analysis. In Florida, the state legislature has conferred specific authority on home rule counties to grant franchises to private parties for the

---

**25.** This statement is not inconsistent with testimony that the directors also based their decisions on concern for the quality of service to the public. *See, e. g.,* Michael Deposition at 68, Martin Deposition at 69–70. A private business's long-range planning would require that its decisions be based on quality of service as well as on more immediate maximization of revenues. *Cf. Knutson v. Daily Review,* 468 F.Supp. 226, 239–240 (N.D.Cal.1979).

operation of airport concessions. *See* Fla. Stat. § 125.012(17). Thus, under *City of Lafayette*, defendants' contention that the county was engaged in governmental activity is supported by what appears to be a legislative determination that the granting of exclusive franchises will further state policies. However, the Court must ultimately conclude that the Directors of Aviation's decisions were not sufficiently governmental for the purposes of *Noerr-Pennington*.

Although the Florida state legislature authorized Dade County to grant franchises for the operation of airport concessions, it also warned that in fixing rates and charges for the use of airport facilities Dade must not violate the constitution and laws of the United States. Fla.Stat. § 125.012(10). A significant part of plaintiffs' claim is that defendants influenced the airport officials to set unreasonable conditions and requirements for new concessionaires' entry onto the on-airport car rental market. To the extent these entry requirements can be considered "rates * * * and * * * charges for the use of * * * airport facilities," the Court can conclude that the Florida legislature, in granting home rules counties the right to allocate airport concessions, did not grant them the right to do so in a manner that would violate the antitrust laws.

The non-governmental nature of the airport officials' decisions is also suggested by a Florida state court case, *Miami Beach Airline Service v. Crandon*, 159 Fla. 504, 32 So.2d 153 (1947). In *Miami Beach*, a taxicab company brought suit against the county for having granted a competitor an exclusive franchise at Miami International Airport. The basis of the suit was that the county had no legal power to create a monopoly that would hamper it in its governmental capacity. In ruling in favor of the county, the Florida Supreme Court concluded that the franchise agreement was valid because Dade County was engaged in an activity that was "essentially proprietary and in no respect governmental." *Id.* at 155. This decision has recently been cited with approval by a lower Florida state

court. *See Smith v. Canaveral Port Authority*, 345 So.2d 357, 357 (Fla.App.1977).

A more significant decision influencing this Court's analysis is the *Chestnut Fleet Rentals* case. As noted earlier the court in *Chestnut Fleet Rentals* initially held that the decision of Dade County's Director of Aviation to restrict the on-airport car rental market at Miami International Airport was "of a commercial nature, not of a governmental nature." *See supra,* at 1082. Although the Court cannot grant this initial denial of summary judgment collateral estoppel effect, it does note that the Eastern District of Pennsylvania's decision was reached after consideration of the arguments raised by The Hertz Corporation, Avis Rent-A-Car System, Inc., and National Car Rental System, Inc., all of which are defendants in the Miami litigation before this Court.

The final reason for this Court's denial of defendants' summary judgment motion with respect to Miami is the most important. Not only were the concession allocation decisions made by a local governmental unit, but they were made in a non-policy-making, non-governmental manner. Dade's Director of Aviation testified in deposition that in his operation of Miami International Airport he was performing an enterprise, or proprietary function. Judy Deposition at 314–315. Moreover, he admitted that the basis for granting defendants their long-term exclusive concessions was

> "financial. They agreed to this huge guarantee of revenue, and in turn we said that, 'We would give you an exclusive franchise for that period.' " *Id.* at 35–36.

Also, he indicated that, with some qualifications, his decisions regarding allocation of car rental concessions would have been the same had the airport been owned and operated by a private company rather than by the county. *Id.* at 70, 73–74, 159–160.

Although Mr. Judy stressed that he had an obligation to serve the public in addition to an obligation to maximize revenues, this Court cannot grant defendants' motion for summary judgment on grounds of "govern-

mental activity." *See id.* at 18. The car rental decisions were made by a local governmental unit. There is a strong argument that the municipality would not be protected from the antitrust laws by the state action exemption as developed by *City of Lafayette.* The considerations influencing the airport officials' decisions were for the most part those that any good businessperson would consider. For these reasons, defendants' motion with respect to Miami must be denied as well.

## II. *CAUSATION*

The second basis for defendants' first summary judgment motion is causation. They contend that their conduct was neither a cause in fact nor a proximate cause of plaintiffs' injury. With respect to cause in fact, defendants' main argument is that the decisions of the airport officials were an intervening, superseding factor that broke the chain of causation. Alternatively, defendants suggest that plaintiff Budget was injured only as a result of its failure to seek an on-airport car rental concession in Denver and Miami, and that their conduct could not therefore be the cause in fact of any harm that Budget suffered.[26] With respect to proximate cause, defendants contend that as a matter of law that an attempt to influence a government official cannot be the cause of harm suffered by a private party as the result of some official action. Because the Court finds genuine issues of material fact exist, however, and because it disagrees with defendants' proximate cause argument, it must deny this motion as well.

The starting point for the Court's discussion of causation is section 4 of the Clayton Act, 15 U.S.C. § 15. That section permits "[a]ny person who shall be injured in his business or property *by reason of* anything forbidden in the antitrust laws * * *"

(emphasis added) to bring a private treble damage action in federal district court. The underlined language has been interpreted as requiring plaintiffs to prove a causal connection between their alleged injury and defendants' wrongful acts.[27] *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Commerce Tankers Corp. v. Nat'l Maritime U. of Amer.,* 553 F.2d 793, 800–801 (2 Cir.), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977).

 Courts have not required plaintiffs to prove that defendants' acts were the *sole* cause of injury. Rather, in keeping with general tort law, they have determined that the causation requirement may be met by proof that defendants' violation was either a "material cause" of plaintiffs' injury or that it was a "substitutional cause," notwithstanding that other factors also contributed. *See, e. g., Zenith Radio Corp., supra,* 395 U.S. at 114 n.9, 89 S.Ct. 1562 (material); *PermaLife Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 143–144, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (White, J., concurring) (both); *Continental Ore Co., supra,* 370 U.S. at 702, 82 S.Ct. 1404 (material); *Commerce Tankers Corp., supra,* 553 F.2d at 800–801 (both); *Haverhill Gazette Co. v. Union Leader Corp.,* 333 F.2d 798, 806 (1 Cir.), *cert. denied,* 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1974) (substantial); *E. V. Prentice Machinery Co. v. Associated Plywood Mills, Inc.,* 252 F.2d 473, 479 (9 Cir.), *cert. denied,* 356 U.S. 951, 78 S.Ct. 917, 2 L.Ed.2d 844 (1958) (substantial); Restatement (Second) of Torts, § 431 (1965) (substantial). Moreover, they have only required plaintiffs to establish "with reasonable probability" the existence of some causal connection between defendants' wrongful acts and some loss of anticipated revenue. *See E. V. Prentice Machinery Co., supra,*

---

**26.** Because Budget's lawsuit was settled and dismissed on February 8, 1979, this alternative argument need not be addressed. However, because Miami International Airport is served by a Budget licensee, the Court will consider defendants' Miami contentions on the ground that defendants' argument might be directed against the licensee.

**27.** This requirement is closely linked to the concept of "standing" to sue. *See infra* at 1104; *see also Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073, 1076 (9 Cir. 1970), *cert. denied,* 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971); D. Berger and R. Bernstein, An Analytical Framework for Antitrust Standing, 86 Yale L.J. 809, 810–811 (1977).

252 F.2d at 477; *Flintkote Co. v. Lysfjord,* 246 F.2d 368, 392 (9 Cir.), *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957).

■ Causation is a question of fact. *See Pacific Coast Agr. Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1205–1206 (9 Cir. 1975), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5 Cir. 1974). For that reason, the courts have hesitated in granting summary judgment against plaintiffs on the causation issue, particularly in antitrust cases. *See, e. g., Weiman Co. v. Kroehler Mfg. Co.,* 428 F.2d 726, 729 (7 Cir. 1970). It is only when plaintiffs have "failed to develop a theory or to set out any facts in the depositions and other documents that have been filed which would show a causal link * * *," *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 98 (3 Cir.) *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976), or when "undisputed facts" establish that there could be no causal connection as a matter of law, *see, e. g., Lee-Moore Oil Co. v. Union Oil Co.,* 441 F.Supp. 730 (M.D.N.C.1977), that courts have been willing to grant summary judgment on causation in favor of defendants.

■ Defendants' first causation argument is based on the absence of cause in fact. Contending that the airport officials acted independently in deciding to restrict entry onto the on-airport car rental market, and that their own suggestions and advice were not a factor in the decisionmaking process, defendants contend that the decisions of the airport officials were an intervening, superseding factor that broke the chain of causation. While the Court might agree with this argument if it were undisputed that the airport officials made their decisions without regard to outside influence, it finds that plaintiffs have introduced sufficient evidence of defendants' influence to create a triable issue of fact.

In Austin, for example, although the airport director, Col. Murphy, testified in deposition that he reached his decisions without regard to outside influence, *see* Murphy Deposition at 18–19, 135–136,[28] there is evidence before the Court that might lead a jury to conclude otherwise. For example, Col. Murphy also testified that representatives of the "Big Three" met privately with him to express their position that Austin should not add a fourth car rental concession. *See id.* at 90–91. In addition, the record contains lengthy memoranda from Hertz, Avis, and National, all sent within a four-day period, outlining their opposition to the addition of a fourth concessionaire. Exhibits 111, 112, 113. Moreover, Col. Murphy's May 27, 1965 recommendation that Austin restrict its car rental concessions to the present three (Exhibit 106) was written only two days after a Hertz representative had called him and had sent a "copy of material which we have successfully used on other occasions to limit the number of concessionaires in Airports in various sections of the country." Exhibit 114. *See also* Murphy Deposition at 50–51.[29] Finally, the record contains a memorandum written by a field operations manager for National that stated:

> "As soon as news first broke on Budget trying to get in at San Antonio, I contacted Austin. Budget is owned and operated by the same licensee out of San Antonio. *Hertz, Avis, and National met with the airport manager and worked out an agreement.* The airport manager does not want a fourth operator on airport. We will get a copy of the new contract to the legal department as soon as we receive it." Exhibit 56 (emphasis added).

It may well be that the Austin Director of Aviation was not influenced by defendants in his decisions regarding allocation of car rental concessions. However, in light of the evidence just discussed, the Court must leave resolution of that question to the jury.

---

**28.** Col. Murphy's successor, Roy E. Bayless, has testified similarly. *See* Bayless Deposition at 27, 33, 44.

**29.** In addition, Col. Murphy admitted using some of the reasons underlying Hertz' position in his presentation to the City Council. *See, e.g.,* Murphy Deposition at 119, 122, 127.

Plaintiffs have submitted sufficient evidence to create a dispute as to whether defendants' conduct was a cause in fact of their injury in Austin.[30]

The Directors of Aviation in Denver also testified that their decisions regarding car rental concessions were their own. See Martin Deposition at 76–79; Michael Deposition at 85–86. But again plaintiffs have introduced evidence from which a jury could find to the contrary. For example, the record contains letters from Hertz and National objecting to the proposed addition of another car rental concession at Stapleton Airport. Exhibits 119, 120; see also Michael Deposition at 18. In addition, it contains a letter from Hertz to the Director of Aviation in which Hertz offered to assist in the drafting of bid specifications for the airport. Exhibit 121. Moreover, it contains three letters, dated July 1965, February 1966, and March 1966, in which Hertz proposed specific language it wished to have inserted in the pending car rental concession agreements Exhibits 122, 123, 124. Included in these proposals were provisions that a minimum guarantee of the greater of $125,000 or 10% of gross revenues be established, and that the city not grant any additional car rental concession unless the new concessionaire agreed to meet that minimum. These provisions were incorporated into the final concession agreements. See Exhibits 125 ¶ 36, 126 ¶ 36, 127 ¶ 35. Finally, on July 28, 1972, Mr. Michael, the Director of Aviation, wrote the five existing concessionaires to set up a meeting in which they could discuss minimum guarantees and space allocation. In this letter he wrote: "We are receiving considerable pressure from off Airport operators to get on the Airport. The best justification we have to deal with this is the minimum guarantees we receive from on Airport operators."

Again, these "rebuttal" facts are more than sufficient to create a triable issue of fact over whether the airport directors in Denver acted wholly independently of defendants' influence. The jury should be given an opportunity to decide the question of defendants' influence for itself.

In Miami, although the Director of Aviation testified, "I run this airport, and I made the decisions for it. * * * I'm not owned by anyone," Judy Deposition at 256, 244, 251, plaintiffs have again produced evidence from which the jury could find to the contrary. The most telling example is evidence that in 1964, after Olins Rent A Car withdrew as a concessionaire at Miami, Hertz, Avis and National met with representatives of the Port Authority and proposed an increase in their minimum guarantees in exchange for a ten-year extension of the concessions and an agreement that during this period no more than three car rental concessions would be permitted at the airport. Exhibits 136, 137, 138. These proposals were accepted by the airport officials. Exhibit 139; see also Key Deposition at 253.

A motion for summary judgment may not be granted where there is a genuine issue of material fact. See Fed.R.Civ.Pro. 56(c). The evidence presented by plaintiffs certainly creates a genuine issue as to whether defendants' influence over the airport officials' decisions was a "material" or a "substantial" cause of plaintiffs' injury. See cases cited supra, at 1099. The cause in fact argument directed by defendants against all the plaintiffs must therefore be rejected.

Defendants' second cause in fact argument is directed at plaintiff Budget. See supra at 1099 n.26. They contend that Budget did not seek entry onto the Miami airport until 1974, at which point its bid was rejected as being too low Defendants contend that this failure was the true cause

30. Defendants have also argued that plaintiffs would have been denied access to Austin regardless of their influence, because there was no space available for a fourth concession. Although Col Murphy stated on a number of occasions that he would not recommend the award of a fourth concession because of lack of space, see, e. g., Murphy Deposition at 15, 38, 48, 56, 58, 100–101, 116, plaintiffs have introduced rebuttal evidence indicating that there was space available. See, e. g., Exhibit 18; Underwood Deposition at 39, 46.

in fact of Budget's injury. Again, however, the Court disagrees that it can grant summary judgment based on this assertion.

■ The Court agrees with defendants' general proposition that a plaintiff may not claim damages under the antitrust laws for injury resulting from its own inaction. *See, e. g., Zenith Radio Corp., supra,* 395 U.S. at 126–127, 128, 89 S.Ct. at 1578 ("If Zenith's failure to enter the English market was attributable to its lack of desire, its limited production capabilities, or to other factors independent of [defendant's] unlawful conduct, Zenith would not have met its [causation] burden under § 4"); *Cleary v. Nat'l Distillers and Chemical Corp.,* 505 F.2d 695, 697 (9 Cir. 1974) ("A demand and refusal is a prerequisite to a claim of concerted refusal to deal"); *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9 Cir. 1971). However, the underlying factual basis for this proposition is disputed.

Plaintiffs have introduced the affidavit of Leonard Solomon, currently the President of Diversified Services, Inc., a company that "engages in the car rental business as Budget Rent A Car of Miami." Solomon stated that he has "been engaged in the car rental business in [Miami] since 1962" and that

"It has been my position since 1962 that Budget Rent A Car of Miami should be located on the Miami International Airport and I have consistently made efforts, since 1962, to obtain an on-airport concession. Periodically, during the period from approximately 1963 through to 1974, I called or directed my manager to call the Miami International Airport to determine the status of the concession agreements. We were always advised that they were exclusive contracts but that when they expired we would have an opportunity to submit bids." Solomon Affidavit at ¶ 4.

This affidavit is sufficient to call into question defendants' factual contention that Budget failed to seek entry onto the Miami airport during the time period for which these actions were brought.

Even if plaintiffs had not submitted this affidavit, defendants' summary judgment motion would still be denied. Assuming *arguendo* that Budget failed to seek entry onto the Miami airport, there would still exist a disputed issue as to whether its failure could be excused on the grounds of "futility." Although a party may not recover for its exclusion from a market if it failed to seek entry, this failure will be excused if an attempt to obtain entry would have been futile. *See Zenith Radio Corp., supra,* 395 U.S. at 120 n.15, 89 S.Ct. 1562; *Continental Ore Co., supra,* 370 U.S. at 699–702, 82 S.Ct. 1404. In light of the long-term exclusive agreements reached between the Miami airport authority and defendants, a jury could reasonably conclude that further attempts by Budget to seek entry onto the Miami airport would have been futile. Miami's own Director of Aviation testified that he assumed Budget could not legally have been awarded an airport concession between 1958 and 1974. Judy Deposition at 122.

The Court also finds a triable issue of fact with respect to defendants' argument that the sole cause of Budget's failure to obtain a concession in Miami in 1974 was its low bid. Budget concedes that it failed to outbid Dollar in 1974. However, it has submitted an affidavit stating that it could not responsibly have bid higher because the bid specifications were drafted so as to place a successful fourth bidder "at a severe competitive disadvantage." Solomon Affidavit at 4, ¶ 5. Again, a jury might infer from this that defendants' influence over the airport officials was a cause in fact of Budget's exclusion. Defendants' cause in fact arguments must therefore be denied due to the existence of genuine issues of material fact.

■ Defendants' second main argument is that even if they were a cause in fact of plaintiffs' injury, they could not have been a proximate, or legal, cause. They rely on both *Noerr* and *Pennington* for the proposition that a private defendant cannot be the proximate cause of a plaintiff's injury if its only conduct was to influence government

officials to take action that caused plaintiff some harm. The Court finds this argument to be without merit.

The cases relied upon by the Court in establishing the "commercial activity" exception suffice to rebut defendants' argument. In *Whitten, Sacramento Coca-Cola, Hecht,* and *General Aircraft Corp.,* the courts all indicated that a private defendant may be subject to antitrust liability for successfully influencing public officials to make a decision that caused harm to plaintiff. *See also Commerce Tankers Corp., supra,* 553 F.2d at 801 (court's granting of injunction urged by defendants is not a superseding cause). Although none of these cases addressed the issue of proximate cause specifically, their entire foundation would be shaken if defendants' argument were accepted. If an attempt to influence a government official could never be the proximate cause of a private plaintiff's resulting injury, there could never be a commercial activity exception; the courts would deny plaintiffs' claim before getting to that issue. Moreover, despite defendants' reliance on *Noerr* and *Pennington,*[31] the Court is not persuaded that the Supreme Court would have developed a First Amendment exemption from the antitrust laws in those cases if it could have avoided the constitutional issue by basing its decisions on the absence of proximate cause. Defendants' second argument must therefore be rejected as well.

In conclusion, the Court finds that defendants' summary judgment motion based on causation must be denied. There is a genuine issue of fact as to whether defendants' alleged attempts to influence government officials were a cause in fact of plaintiffs' injury. Moreover, the Court cannot conclude as a matter of law that defendants were not the proximate cause of plaintiffs' injury as well.

### III. *STANDING*

The sole basis for defendants' second summary judgment motion is standing. They allege that Dollar lacks standing to sue for injuries resulting from the exclusion of its licensees from certain airports.[32] Noting that Dollar never sought entry onto those airports directly, defendants contend that any injury suffered by Dollar is too remote or incidental to serve as a basis for standing. Defendants therefore raise the issue of whether, or in what circumstances, a licensor may sue for antitrust damages resulting from the exclusion of one or more of its licensees from a particular market.

Again, the starting point for the Court's discussion is section 4 of the Clayton Act, 15

**31.** Regarding *Pennington,* for example, defendants rely on the Supreme Court's statement that "[i]t is clear under *Noerr* that [plaintiff] could not collect any damages under the Sherman Act for any injury which it suffered from the action of the Secretary of Labor." 381 U.S. at 671, 85 S.Ct. at 1594. However, this statement does not impose a proximate cause limitation on the effect of a private defendant's conduct. Rather, it is clear from the next sentence of the opinion that this statement merely reflects the Court's earlier conclusions that

"[t]he conduct of the union and the operators did not violate the Act, the action taken to set a minimum wage for government purchases of coal was the act of a public official who is not claimed to be a co-conspirator, and the jury should have been instructed, as UMW requested, to exclude any damages which Phillips may have suffered as a result of the Secretary's Walsh-Healey determinations." *Ibid.* (footnote omitted).

**32.** This motion was initially brought "against plaintiffs Budget Rent-A-Car Corporation, Budget Rent-A-Car System, Inc., and Dollar Rent-A-Car System, Inc., plaintiffs in actions C-75-2560-CBR and C-77-0876-CBR, respectively, with respect to their claims based on alleged injuries to their franchisees." However, during the briefing period the Budget action was settled and Budget's claims were accordingly dismissed. As a result, defendants declare that their "Joint Motion remains directed only at Dollar, and at such Budget licensee plaintiffs as may act in the capacity of sublicensors."

The Court intends to limit the motion even further. No arguments or facts have been presented with respect to the Budget "sublicensors." The Court is therefore unable to evaluate the nature of their licensing agreements with their sub-licensees or their relationship to the on-airport car rental market. Thus, in ruling upon defendants' motion, the Court will consider only the issue of plaintiff Dollar's standing.

U.S.C. § 15,[33] particularly the words, " * * * injured * * * by reason of anything forbidden in the antitrust laws * * *." Courts have not interpreted these words literally. Rather, they have placed a restrictive gloss on them in order to limit the range of potential antitrust plaintiffs. *See Solinger v. A & M Records, Inc.,* 586 F.2d 1304, 1308 (9 Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 499 (9 Cir. 1977). More specifically, courts have required either that a plaintiff suffer some "direct injury" or that plaintiff be within the "target area" of defendants' violation.

The differences between these two approaches were explained in *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122 (9 Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973):

"Courts adhering to the 'direct injury' test focus principally on the relationship between the alleged antitrust violator and the claimant. Generally, if the claimant is separated from the violator by an intermediate antitrust victim, standing is denied by attaching conclusory labels such as 'remote', 'indirect', and 'consequential'. * * *

"In contrast, courts employing the 'target area' approach focus on claimant's relationship to the area of the economy allegedly injured by the defendant.

" '[T]o state a cause of action under the anti-trust laws a plaintiff must show more than that one purpose of the conspiracy was a restraint of trade and that an act has been committed which harms him. He must show that he is within that area of the economy which is endangered by a breakdown of com-

petitive conditions in a particular industry. Otherwise he is not injured "by reason" of anything forbidden in the anti-trust laws.'

*Conference of Studio Unions v. Loew's Inc.,* 193 F.2d 51, 54–55 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). To attain standing [under the "target area" approach], a plaintiff must thus allege that the antitrust violation injured a commercial enterprise of the plaintiff in the area of the economy in which the elimination of competition occurred. Standing is denied, on the other hand, if the claimant's commercial activity occurred outside that area of the economy." 481 F.2d at 127–128.

 In evaluating challenges to antitrust plaintiffs' standing, the Court of Appeals for the Ninth Circuit has chosen to follow the "target area" approach, which "provides a logical and flexible tool for analyzing whether a particular claimant falls within the class of persons slated by Congress for protection under section 4 of the Clayton Act," rather than the "direct injury" approach, which often results in a denial of standing "to any plaintiff who happens to fall within certain talismanic rubrics [such as] 'creditor', 'landlord', 'lessor', 'franchisor', [and] 'supplier.' " *Id.* at 128, 127 & n.7; *accord, Solinger, supra,* 586 F.2d at 1310; *Bosse v. Crowell, Collier & Macmillan,* 565 F.2d 602, 606 (9 Cir. 1977); *John Lenore & Co., supra,* 550 F.2d at 499; *Blankenship v. Hearst Corp.,* 519 F.2d 418, 425–426 (9 Cir. 1975). Accordingly, in analyzing defendants' arguments the Court will use the "target area" approach. First, it will identify the area of the economy that was the target of defendants' allegedly anticompetitive conduct.[34] Then, it will de-

---

**33.** This statute provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

**34.** In identifying the target area, or the "area of the economy which is endangered by a breakdown of competitive conditions in a particular industry," *Conference of Studio Unions v. Loew's,* 193 F.2d 51, 54–55 (9 Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952), the Court can consider the area that "could reasonably be foreseen would be affected" by defendants' conduct. *See Blankenship, supra,* 519 F.2d at 426, *quoting Mulvey v. Samuel Goldwyn Productions, supra,* 433 F.2d at

termine whether plaintiff's alleged injury occurred within that target area. *See Blankenship, supra,* 519 F.2d at 426.

■ The Court finds the issue of Dollar's standing to be controlled by the opinion in *Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358 (9 Cir. 1955). Plaintiff in *Karseal* was a manufacturer of car wax. In order to reach the retail market, plaintiff sold its wax to franchised distributors who in turn sold it to independent service stations. Among the potential customers for plaintiff's car wax were the service stations that sold defendant's gasoline. However, plaintiff alleged that this market was foreclosed to its franchisees by the exclusive dealing contracts entered into by defendant and its service stations. Plaintiff brought suit under Section 1 of the Sherman Act and Section 3 of the Clayton Act seeking recovery of the lost profits it would have made had its franchisees been permitted to sell to defendant's service stations.

The Court of Appeals' opinion focused on the issue of plaintiff's standing. Applying the "target area" approach, it asked

"whether Karseal's business and wax product is 'within that area of the economy which is endangered by a break-down of competitive conditions in a particular industry.' * * * Assuming Karseal was 'hit' by the effect of the Richfield antitrust violations, was Karseal 'aimed at' with enough precision to entitle it to maintain a treble damage suit under the Clayton Act?" 221 F.2d at 362 (citation omitted).

The court concluded that plaintiff could proceed with its suit even though defendant's illegal restraint had its most immediate impact on the retail level and even though plaintiff was not a direct supplier of car wax at that level.[35] It reached this result by finding that the area of the economy affected was the car wax market as a whole, and that plaintiff's injury occurred within that market.[36]

Similarly, this Court finds that although the car rental defendants' allegedly anticompetitive conduct had an immediate impact on the on-airport car rental market, their activities were directed against competing car rental companies and the entire business of supplying rental cars at airports. By seeking the exclusion of Dollar's licensees, logo, and rental system from the on-airport market, and by seeking to eliminate a considerable source of income from Dollar with respect to those airports at which its licensees had sought entry, defendants "aimed at" Dollar just as surely as defendant in *Karseal* aimed at its competing supplier of car wax. Plaintiff's allegations of a nationwide conspiracy strongly reinforce this conclusion.

Moreover, just as the plaintiff manufacturer in *Karseal* was deeply involved in the car wax market, so too was plaintiff Dollar deeply involved in the on-airport car rental market. Although Dollar did not itself provide the automobiles or perform the rental transactions in the challenged markets, it did offer its licensees advice and expertise in their performance of these functions. The standard License Agreement indicated that Dollar would inform and advise its licensees with regard to "methods of operation and accounting, advertising and publicity service, insurance programs, and the style and character of equipment, furnishings and appliances for conducting a Vehicle Renting Business." Dollar also provided "signs, decalcomanias, standard rental agreements, letterheads, envelopes, invoices, statements, rate folders, operating and accounting forms, promotional materials and other similar materials" to its licensees.

---

1076; *Twentieth Century-Fox Film Corp. v. Goldwyn,* 328 F.2d 190, 220 (9 Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964).

**35.** Although plaintiff's franchisees had not sought to intervene, it seems clear that they too would have had standing to bring suit against defendant. 221 F.2d at 364.

**36.** The court stated that defendant's

"illegal acts were directed against the manufacturers and distributors of the competing *products,* including Karseal's wax. Such persons and such products were the 'target' of the illegal practices." *Id.* at 364 (emphasis added).

Further, Dollar's Vice President, Gary Paxton, testified in deposition that Dollar assisted its licensees in negotiating airport contracts and in formulating bids for airport concessions. Paxton Deposition at 81. In addition, Paxton indicated that Dollar stood ready to assume a front-line position if one of its licensees failed in its contractual obligation to "make every reasonable effort" to obtain entry onto airports within its territory.[37] Finally, Dollar's involvement in the on-airport car rental market is shown by its willingness to co-sign airport concession agreements with its licensees in the capacity of guarantor and, in some instances, to execute concession agreements on behalf of its licensees. Caruso Deposition at 64–65.

The Court's conclusion might differ if Dollar's only involvement with its licensees had been as a supplier of automobiles, of rental transaction forms, or of some other product. In such a case, although plaintiff would surely be injured by defendants' conduct, the Court might find its connection with the car rental business to be too tenuous to warrant a finding that plaintiff has standing. But in the situation presented, where Dollar is intimately involved in the on-airport car rental market, where it offers its licensees advertising, promotional aids and assistance at many levels and stages of the business, and where it is a direct competitor of defendants in many car rental markets, the Court must conclude that Dollar has standing to sue for the damages it may have suffered.[38] To quote *Karseal* with some modifications,

> "To say to a manufacturer of wax [or a renter of cars] that he may have the protection of the antitrust laws in private litigation if he hires salesmen [or car

rental agents] for his product, and not have such protection if he decides to contract with a distributor [or licensee], would appear to be an unequal application of the law and [an] unjustified dictation as to how he [should] operate * * * his business." 221 F.2d at 364–365.

Defendants seek to avoid this result by citing two cases that denied standing to franchisors damaged by conduct that was more directly felt by their franchisees. However, these cases are distinguishable, both on their facts and on the legal standards applied.

In *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183 (2 Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971), plaintiff was a franchisor of companies that produced and bottled its "Billy Baxter" line of soft drinks. Defendants were two soft drink manufacturers. Alleging that defendants had induced its franchisees' retail customers not to purchase "Billy Baxter" soft drinks, plaintiff brought suit to recover the royalties it would have earned from its franchisees had their sales not been adversely affected by defendants' conduct.

The Court of Appeals for the Second Circuit, over a vigorous dissent, found that plaintiff lacked standing. In contrast to *Karseal*, the court concluded that the "target area" of defendants' conduct was not plaintiffs' product; rather, it was merely the retail market for that product. In denying standing, the court noted that plaintiff

> "was not only one step removed from the link in the production-distribution chain receiving the first impact of the alleged misconduct, but also it [lacked] * * * comprehensive responsibilities for and identification with the beverages. * * *

---

**37.** Paxton testified that

"if [the licensee] does not make that effort, then [Dollar has] the right to make that effort and operate that terminal [itself] or give that terminal to a different licensee [although the initial licensee] would still retain his area minus the terminal." Paxton Deposition at 38.

**38.** The Court also notes that, as in *Karseal*, the extent of plaintiff's injury can be readily calcu-

lated once the amount of its licensees' lost sales is determined. Plaintiff's standard license agreement provides in Section II, ¶ 2.19, that each licensee shall pay 8% of its total gross monthly receipts in consideration of the benefits it receives from Dollar. Thus, there is no greater difficulty in assessing Dollar's damages as licensor than there would have been had it sought to service the airports directly.

[It] merely licensed the information needed for the manufacture of the beverages, supplied ingredients which still others had manufactured, and left further production activities to its franchisees." *Id.* at 188 (footnote omitted).

Not only did plaintiff not compete in the retail market, but aside from a secret beverage extract that it purchased from an outside source, it neither " 'manufactured, bottled, distributed nor sold [any] products' * * * to its franchisees." *Id.* at 185.

*Billy Baxter* is not controlling here. First, it arose in a circuit that applies a more restrictive test for standing than the Ninth Circuit applies. *See In re Multidistrict Vehicle Air Pollution, supra,* 481 F.2d at 127 n.7 (Second Circuit applies its "own particular mixture * * * of the two tests [that] more closely resembles the 'direct injury' test"); *see also Long Island Lighting Co. v. Standard Oil Co. of Calif.,* 521 F.2d 1269, 1274 (2 Cir. 1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976). Second, it involved a plaintiff who was neither a competitor of defendants nor deeply involved in the affected market. As was noted in a later case arising in the same circuit, Billy Baxter, Inc., had only a "circumstantial role" in the manufacture and distribution of its product. *Sulmeyer v. Seven-Up Corp.,* 411 F.Supp. 635, 638 n.4 (S.D.N.Y.1976).[39] Dollar's role in the car rental business was significantly greater.

The second case cited by defendants, *Nationwide Auto Appraiser Serv. v. Assoc. of C & S Co.,* 382 F.2d 925 (10 Cir. 1967), is even less persuasive than *Billy Baxter.* It has been referred to by the Court of Appeals for the Ninth Circuit as an example of the "regrettable tendency [among adherents of the "direct injury" approach] to deny standing to any plaintiff who happens

to fall within certain talismanic rubrics." *In re Multidistrict Vehicle Air Pollution, supra,* 481 F.2d at 127 & n.8. Moreover, the deciding court explicitly stated that it was applying a test for standing that was stricter than the Ninth Circuit's test. 382 F.2d at 928–929.

Even if *Nationwide Auto Appraisers* had been analyzed under the "target area" approach, it would be distinguishable. Plaintiff Nationwide was a franchisor of automobile damage appraisers. Defendants were various associations of insurance companies that were alleged to have "influenced their members to 'sponsor' a single appraiser in a particular locality," thereby excluding plaintiff's franchisees" from a substantial segment of the damage appraisal business." 382 F.2d at 926. However, neither plaintiff nor defendants were in the automobile damage appraisal business themselves.

The most significant difference between *Nationwide Auto Appraisers* and the car rental cases involves the parties' relationship to the affected market. As noted, the *Nationwide* defendants did not compete with plaintiff in the damage appraisal business, or for that matter, in any other business. *See id.* at 928 (distinguishing *Karseal* as involving competitive products of plaintiff and defendant). By contrast, Dollar and defendants in the cases at bar are competitors. Moreover, they compete in their primary line of business, car rentals. This is a sufficient basis for distinguishing *Nationwide Auto Appraisers.*

Having concluded that plaintiff Dollar meets the "target area" test, and that the cases cited by defendants are inapposite, the Court is left with only one more argument to consider. Defendants have sug-

---

**39.** For many reasons, the car rental cases are more similar to *Sulmeyer* than to *Billy Baxter. Sulmeyer* also involved a company, Bubble Up, that sold soft drink extracts to its franchised bottlers. However,

"unlike the plaintiff in *Billy Baxter,* Bubble Up has asserted that it, like defendants, manufactured concentrates, franchised bottlers, supplied advertising and promotional material, offered substantial assistance to its fran-

chisees, and was actively involved in supervising the work of the franchisees. Plaintiffs allege that Bubble Up was directly in competition with defendants, that defendants have directly sought to limit not only Bubble Up's franchises but also Bubble Up itself, and to that end, defendants have instituted litigation in foreign countries and coerced bottlers who were potential franchisees of plaintiffs." *Id.* at 638 (footnote omitted).

gested that the "rationale" of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), militates against a finding that Dollar has standing. The Court does not agree.

Stated briefly, the Supreme Court held in *Illinois Brick* that an indirect purchaser may not sue an antitrust violator for price fixing under section 4 of the Clayton Act. In reaffirming and extending *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Court determined that a "passing-on" theory could not be used offensively any more than it could be used defensively. The Court's "rationale" was that the risk of multiple liability and the danger of "massive evidence and complicated theories" would be significantly increased if both indirect and direct purchasers were permitted to be antitrust plaintiffs.

Defendants assume that these same considerations would be present if Dollar were permitted to sue for injuries that were more directly felt by the Dollar licensees. However, this assumption is unwarranted.

First, there is no serious threat that a grant of standing to Dollar would lead to multiple liability. The damage allegedly suffered by Dollar is lost royalties. The damage allegedly suffered by the licensees is lost revenues. Assuming recovery, there is no reason why Dollar and those licensees that have been joined as plaintiffs would not be entitled to recover their separate losses and each have their respective amount trebled. In the markets where Dollar sued, but its "excluded" licensees did not, Dollar would be entitled only to its lost royalties.

Second, although Dollar must establish damage to its licensees before it can prove damages to itself, Dollar's damages can be easily calculated once it demonstrates its licensees' lost revenues. In contrast to *Illi-*

nois *Brick* and *Hanover Shoe*, there would be no need to analyze and trace the effects of the immediate plaintiff's injury on the more remote plaintiff. Rather, Dollar's damages could be computed simply by applying the percentage set by the License Agreement to the licensees' lost revenues.

Finally, although Dollar must prove its damages by reference to its licensees' lost revenues, this method of proof would not unduly complicate the trial. Defendants do not contend that *no one* can sue for the exclusion of Dollar's licensees from the on-airport market. They do not deny that the licensees should be permitted to sue. But if the licensees were permitted to sue they would introduce the same evidence in support of their damage claims that Dollar would produce. The litigation would therefore not be simplified by a ruling that Dollar lacks standing to sue. The "rationale" of *Illinois Brick* is therefore not applicable.

To summarize, the Court has found that Dollar has standing to sue for lost royalties even though some of its licensees were more directly "hit" by defendants' allegedly anticompetitive activities. Defendants' conduct was directed against the on-airport car rental market. Dollar was deeply involved in that market. Moreover, defendants could reasonably have foreseen that Dollar would be affected by their conduct. In keeping with congressional policy to encourage private treble damage actions as a means of antitrust enforcement, the Court must find that dollar has standing. Nothing in *Illinois Brick* compels a contrary result.

## IV. *BURDEN OF PROOF*

Defendants' third and final motion is for a pretrial order with respect to burden of proof. Relying on Rule 16 of Federal Rules of Civil Procedure,[40] which permits the

---

40. Rule 16 provides:
"In any action, the court may in its discretion direct the attorneys for the parties to appear before it for a conference to consider
"(1) The simplification of the issues;
"(2) The necessity or desirability of amendments to the pleadings;

"(3) The possibility of obtaining admissions of fact and of documents which will avoid unnecessary proof;
"(4) The limitation of the number of expert witnesses;
"(5) The advisability of a preliminary reference of issues to a master for findings to be

Court to make pretrial rulings in the interest of facilitating preparation for trial, defendants seek an order that would require plaintiff Dollar to prove "fact of damages" at trial on an airport-by-airport basis. Their suggested order provides:

"As to each airport for which plaintiff claims damages by reason of its exclusion, plaintiff shall be required at trial to present sufficient evidence from which a jury can conclude that there was a causal connection between the allegedly unlawful acts of defendants and plaintiff's claimed exclusion from each airport."

█ Although the Court has not found a case that deals with this question directly, it concludes in light of general principles of antitrust torts and remedies that defendants' motion should be granted.[41]

█ The Court wishes to emphasize at the outset that its pretrial order applies only to Dollar's proof of the *fact of damages*. Antitrust plaintiffs have long been required to prove three separate elements before recovering treble damages; that defendants have violated the antitrust laws; that some damage has resulted from this violation; and that the amount of damages is roughly ascertainable. The Court finds that before Dollar can recover damages resulting from its exclusion from any one particular airport, it must prove the second element, fact of damages, with respect to that airport. This is in keeping with the long-established principle that although plaintiff's burden of proving the *amount* of its damages may be relaxed in an antitrust case, its burden of proving the *fact* of its damages is never lightened. *See Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Flintkote Co. v. Lysfjord, supra*, 246 F.2d at 392.

█ In proving fact of damages, an antitrust plaintiff must show with reasonable probability the existence of a causal connection between defendants' antitrust violation and its injury.[42] *See Pacific Coast Agr. Export Ass'n, supra*, 526 F.2d at 1205–1206; *Knutson, supra*, 468 F.Supp. at 229 & n.3. Dollar's opposition to defendants' motion is based on its assertion that it can meet this burden by establishing that defendants entered into a national conspiracy, and then by showing a resultant "general pattern of exclusion" from the nation's airports. *See Richfield Oil Corp. v. Karseal Corp.*, 271 F.2d 709 (9 Cir. 1959), *cert. denied*, 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960). The Court disagrees.[43]

used as evidence when the trial is to be by jury;

"(6) Such other matters as may aid in the disposition of the action.

"The court shall make an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel; and such order when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice. The court in its discretion may establish by rule a pre-trial calendar on which actions may be placed for consideration as above provided and may either confine the calendar to jury actions or to non-jury actions or extend it to all actions."

41. Plaintiff has argued that this order is premature and that the Court can grant a directed verdict at the end of Dollar's case if fact of damages is not adequately proved. The Court agrees that it would not permit a jury award with respect to airports for which no evidence had been presented. However, it does not agree that this obviates the need for the proposed order. One of the purposes of Rule 16 is to permit the Court to "make rulings on questions of law in order to facilitate preparation for trial." 3 Moore's Fed.Prac. 2d §57 16.16, at 1125. The proposed pre-trial order will further this purpose, primarily by offering guidance as to the scope of discovery. *See* Manual for Complex Litigation, § 1.80, at 80–81 (1977).

42. For a more complete discussion of the applicable causation standards and how they affect this case, *see supra*, at 1099–1100.

43. The Court recognizes that causation is generally a question of fact for the jury. *See, e. g., Continental Ore, supra*, 370 U.S. at 700–701, 82 S.Ct. 1404. However, the issue of whether plaintiff's causation evidence is sufficient to get to the jury is a question of law. *See, e. g., Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3 Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

In the second *Karseal* case, relied upon by plaintiff, the Court of Appeals for the Ninth Circuit affirmed a jury verdict awarding treble damages to plaintiff Karseal. This verdict was based on a finding that defendant Richfield had conspired to restrain the sale of Karseal's wax at the approximately 3,000 service stations that sold Richfield gasoline. Although the jury was permitted to award damages on the basis of plaintiff's lost sales to *all* of Richfield's stations, the trial court had not required Karseal to prove exclusion of its product from each station separately. Rather Karseal was permitted to introduce representative evidence from which the jury could find "a general pattern of exclusion." 271 F.2d at 712.[44]

A "general pattern of exclusion" from the nation's airports will not be sufficient to show fact of damages in the cases at bar, however, even if plaintiff first establishes a national conspiracy. In *Karseal*, unlike the present situation, plaintiff's burden of proving fact of damages was met in part by a prior decree in a government civil suit. This decree stated that Richfield's exclusive dealing contracts had " 'the necessary and intended effect of denying manufacturers and suppliers of * * * automotive accessories, competitive to those manufactured or sponsored by Richfield, access to a

substantial number of outlets.' " *Id.* at 711. Moreover, it indicated that the anticompetitive impact of defendant's conduct reached every service station with which defendant had an exclusive dealing agreement. The only question left for the jury to determine was whether plaintiff's wax was among the *products* falling within the "automobile accessories" language of the prior decree. *Id.* at 713, 727. There was no need for a redetermination of the geographic impact of Richfield's exclusive dealing contracts.

In the cases at bar, there is no prior decree establishing impact at each airport. To the contrary, defendants have submitted voluminous materials in support of their motions indicating that the factors leading to Dollar's exclusion differed greatly from airport to airport.[45] See *Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541, 548 (E.D.Pa.1976). Unlike *Karseal*, where the prior decree established the geographic scope of defendant's antitrust violation and plaintiff was permitted to use "pattern evidence" merely to show that its product was among the products found to be affected by this violation, there is no showing here that defendants' conduct had an impact at each airport from which plaintiff claims it was excluded. *Karseal* is therefore not controlling.[46]

**44.** According to the Ninth Circuit Court of Appeals, this evidence was as follows:

"The testimony offered by Karseal consisted of distributors and salesmen for 'Wax Seal,' a former Richfield service station operator, a former merchandiser for Richfield, a former TBA man for Richfield and an independent service station operator and others. Without enumerating the testimony in detail, the record shows that distributors for 'Wax Seal' were generally unsuccessful in their efforts to sell their product to Richfield TBA men and Richfield service stations; that a Richfield representative told the Richfield service station operator to get Wax Seal out of his window or they would both lose their jobs; that salesmen for 'Wax Seal' were told not to come in when Richfield men were around; that 'Wax Seal' was occasionally sold in Richfield service stations but kept under the counter and not displayed. A former merchandiser for Richfield testified that he would warn and threaten Richfield dealers who carried nonauthorized TBA products. A Richfield merchandiser told a Richfield oper-

ator he did not want to see 'Wax Seal' in the station." 271 F.2d at 712.

**45.** It was in anticipation of such a situation that the Court, in its first pretrial order, required the parties to support their *Noerr-Pennington* and causation argument with specific facts obtained through discovery at the "test" airports.

**46.** This conclusion is supported by the "motion picture" cases cited by defendants. In *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), the Supreme Court upheld a finding that Paramount and others had entered into a nationwide conspiracy to restrict the distribution and exhibition of motion pictures. Following this decision, numerous private theater owners filed antitrust damage suits against the *Paramount* defendants based on the conspiracy established in the government's case. *See, e. g., Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed.

As the Court's analysis in earlier parts of this opinion has demonstrated, many factors could have caused Dollar's exclusion from the on-airport car rental markets. Some of these factors—such as a failure by Dollar to seek entry or an exercise of independent judgment by an airport official—were outside of defendants' control. Unlike *Karseal*, where defendant Richfield entered into identical exclusive dealing contracts with each of its service stations and therefore exercised contractual control over whether plaintiff's product could enter the market, defendants here lacked such universal dominant control. Their influence had to be asserted upon a different airport official at each airport. Thus, even if Dollar were able to prove that defendants had embarked on a nationwide conspiracy to eliminate plaintiff as a competitor, and that the conspiracy had successfully been executed at a handful of selected airports, the Court would still not permit the jury to infer that the conspiracy was successful at the airports for which no evidence was introduced. Too many independent factors could have been the cause of the exclusion. *Cf. Zenith, supra*, 395 U.S. at 114, 89 S.Ct. 1562. Dollar should not be permitted to recover damages for its exclusion from airports without some showing that it sought entry, or that it would have been futile to seek entry, and without a showing that defendants had approached the airport authorities with the goal of excluding plaintiffs.

The Court does not mean to suggest that plaintiff must produce evidence negating every possible cause of its exclusion other than defendants' conduct. *See Zenith, supra*, 395 U.S. at 114 n.9, 89 S.Ct. 1562; *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9 Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977), *on remand*, 468 F.Supp. 226 (N.D.Cal.1979). It

is merely stating that with respect to each airport for which damages are claimed, Dollar must produce evidence sufficient for the jury to infer that defendants' conduct was a cause of its exclusion. *See Continental Ore Co., supra*, 370 U.S. at 697, 82 S.Ct. 1404. The jury will not be permitted to award damages for plaintiff's exclusion from any airport 'for which such evidence has not been presented.

Accordingly, IT IS HEREBY ORDERED that defendants' summary judgment motion with respect to the airports at Austin, Texas; Denver, Colorado; and Miami, Florida, on the grounds of *Noerr-Pennington* and causation is denied.

IT IS HEREBY FURTHER ORDERED that defendants' summary judgment motion directed against plaintiff Dollar on grounds of standing is denied.

IT IS HEREBY FURTHER ORDERED that defendants' motion for a pretrial order with respect to burden of proof is granted.

---

273 (1954); *Sun Theatre Corp. v. RKO Radio Pictures, Inc.*, 213 F.2d 284 (7 Cir. 1954); *Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp.*, 194 F.2d 846 (8 Cir. 1952), cert. denied, 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952); *Sablosky v. Paramount Film Distributing Corp.*, 137 F.Supp. 929 (E.D.Pa.1955). In all these cases, plaintiffs were required to

support their claim with evidence that their particular theaters had been affected by defendants' conduct. The courts required this proof because there had been no determination in *Paramount* as to which theaters were affected by defendants' conspiracy and because the governmental decree had only a *prima facie* effect.